UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO: 1:22-cv-524 |
| | ) |
| BOARD OF TRUSTEES OF | ) |
| INDIANA UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1. John Doe ("Doe" or "John"), by his attorney, John Haskin and Associates, for his Complaint against Defendant respectfully alleges as follows:

**THE NATURE OF THIS ACTION**

2. Having been irreparably harmed by false allegations of sexual misconduct, Doe seeks damages and injunctive relief to remedy emotional, mental, economic, and physical harm caused by Defendant. Doe's causes of action include: violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, et seq., and violations of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983.

3. The false accusations of sexual assault were upheld by the Defendant following a biased and one sided investigation that can only be described as a complete failure of justice and due process.

4. Plaintiff alleges that due to gender, the already fundamentally flawed investigation process was irrevocably biased against him. The outcome was preordained. A female student accused a male student of sexual assault and the use of unknown substances to impair the female

student. Despite no supporting evidence that Doe had actually committed sexual assault, and finding that no drugging took place, Defendant condemned and suspended him, causing serious financial and personal injury.

## THE PARTIES

5. Plaintiff, John Doe, is a natural person residing in the State of Indiana. During the events described herein, Doe was a student at Indiana University, Bloomington.

6. Defendant, Indiana University Board of Trustees ("Defendant Indiana Board of Trustees") has ten members, and they as a Board have the responsibility for making rules and regulations to govern the University. The selection of these Trustees is prescribed in Indiana Code IC 21-23-3. Three of the Trustees are selected by the Indiana Alumni Association. The remaining seven Trustees are selected by the Governor of the State of Indiana.

## JURISDICTION AND VENUE

7. This Court has federal and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because: (I) the case arises under the laws of the United States; (ii) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq., and 42 U.S.C. § 1983 are civil rights claims.

8. This Court has personal jurisdiction over Defendant on the grounds that Defendant is conducting business at Indiana University within the State of Indiana.

9. Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claim occurred in this judicial district.

## RELEVANT FACTUAL BACKGROUND

10. Following the Department of Educations ("DOE") "Dear Colleague" letter,

colleges and universities, including Indiana University, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). The White House, in 2014, specifically threatened to withhold federal student aid funding, followed by then Vice President Biden stating that he would like to "take away federal funding" from schools that did not initiate the one sided standards advocated for by the federal government. "*Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault*," Huffington Post, July 4, 2016.

11.     The threat of revoked federal funding represented a mortal threat to Indiana University and other universities as they are highly dependent on federally backed student loans for revenue. This pressure in turn forced Universities to implement Title IX procedures such as those that the Plaintiff was exposed to, wherein the purpose of the investigation is not to find the truth, but rather to find the accused guilty by limiting procedural protections for male students. While these initial federal dictates have since been partially rescinded and amended, the initial impact at Universities such as Indiana University were deep and ongoing, resulting in Title IX investigations and adjudications that systematically target and discriminate against male students on the basis of their sex.

## SPECIFIC FACTUAL ALLEGATIONS

12.     Doe had enrolled for classes at Indiana University - Bloomington beginning in the Fall of 2018.

13.     From the beginning of his time on Campus up to the events of June 16th and 17th 2021, Doe performed well in classes and was not the subject of any formal or informal discipline.

14.     Doe was living off campus in Bloomington during the summer of 2021 and was

not enrolled in any classes.

**The Events of June 16-17, 2021**

15.     On Tuesday June 16, 2021 Doe matched with Jane Doe ("Jane") on a dating app. At 6:07pm Jane sent Doe a text and, following a brief conversation, Jane agreed to come to Doe's house for a date. Doe offered for the pair to go to a restaurant or bar to meet but Jane preferred to meet at Doe's house. Doe picked Jane up at approximately 10:20pm.

16.     Upon arriving and settling at the house, Doe and Jane sat on the couch and conversed. At some point soon after arrival, Doe poured Jane and himself a glass of wine. Approximately 30 minutes later, Jane poured Doe and herself a second glass of wine. In total, Jane later claimed to have drank two and a half glasses of wine.

17.     At approximately 12:15am Jane went to the bathroom and received a video call from Caio Taylor ("Taylor") asking whether Jane needed a ride home. Jane stated she did not. At approximately 12:50 am, Jane sent a text to Taylor stating "looks like I'll be here for a hot minute".

18.     From approximately 12:50 am on, Jane later stated that she "blacked out" and couldn't remember anything. Jane and Doe later gave a statements to the events that followed.

19.     Doe and Jane continued conversing until, at approximately 1:30 am, Jane initiated kissing with Doe. Doe observed that Jane appeared completely cognizant of her actions, was not slurring her speech, and continued to behave normally.

20.     Doe and Jane then retired to Doe's room upstairs wherein Doe and Jane, both math majors, completed complex math problems on Doe's white board. Jane continued to appear completely in control of all her facilities and was not exhibiting any signs of being "blacked out"

or otherwise incapacitated.

21. Jane and Doe then laid in Doe's bed. Jane began initiating sexual contact with Doe. Jane removed her shirt and bra while initiating kissing. Seconds later, Doe requested that they stop as he felt they were moving too fast.

22. Doe left to use the bathroom and upon returning found that Jane had fallen asleep. Doe assumed Jane had decided to sleep at his house and laid down next to her and fell asleep.

23. Later that evening, Jane began receiving calls from her roommate. The calls woke Doe but not Jane. Doe attempted to wake Jane but she refused. Doe eventually answered the call and explained that Jane was asleep and not willing to talk. Jane's roommate stated that she was coming to pick Jane up.

24. Upon arriving, Jane's roommate and Taylor later stated that they found Jane naked in Doe's bed and claimed that she appeared "out of it." They quickly gathered Jane's personal effects and exited the house. After assisting Taylor and Jane's roommate in gathering Jane's belongings, Doe went back to bed.

**Messages between Doe and Jane**

25. The next morning, at approximately 6:29am, Doe sent Jane a text message stating he was "sorry about last night." and "that shouldn't of happened" and asking to talk about it when Jane awoke. Doe later testified that he was referring to the awkward events surrounding Jane's departure when he apologized.

26. Jane responded that she did not know what happened and claimed to remember sitting and talking with Doe and then being picked up by her roommate. Doe explained the course of events and Jane stated that her roommate was angry with her. Jane later stated she "did

not know how she got that drunk" and that she was "really sorry."

27. Jane then stated she needed to "do some damage control" referring to her roommate. Doe and Jane then continued to discuss the events of the previous evening and the extent to which Jane was intoxicated. Approximately seven hours after the initial conversation ended Jane sent Doe a text stating "you do realize you sexually assaulted me, right? I just talked to my roommate and got a much better idea of what happened last night" to which Doe did not respond.

**Jane's complaint and the Title IX Investigation process**

28. Jane reported allegations to both the police department and to the University's Title IX office. The police investigated Jane's allegations and declined to press charges.

29. Several days after the alleged assault, Jane visited the hospital where she underwent a rape test kit and a drug test.

30. The University next engaged in an investigation that included interviewing Doe, Jane, Jane's roommate, Taylor, Doe's roommate, and two other witnesses. Doe obtained counsel in relation to possible charges and to the University's investigation.

31. Doe was not permitted to cross examine any of the witnesses but was permitted to submit written questions to Jane. There is no evidence these questions were presented to Jane by Defendant.

32. Doe was not permitted proper access to his legal representative at any hearing or investigative meeting. The University's policy explicitly denies accused individuals the right to ready access to qualified counsel.

33. Doe was not permitted to review any witness statements or other investigative

material prior to his final hearing and the University's determination.

34. Doe was not permitted to review the exact nature of the allegations against him.

35. Through the investigative process, allegations arose from Jane that Doe had slipped some sort of drug or other material into her drink, as Jane's theory included that she could not have been as inebriated as she claimed she was without such an intervention. Investigator's requested that Jane produce the results of the drug test she took at the hospital but this drug test was never provided.

36. Doe was subjected to unfair immaterial questioning that Jane was not, including but not limited to whether Doe was sexually aroused.

37. On November 24, 2021 Doe received notification that the University's investigation was complete and that Doe was to appear for a final hearing on December 2, 2021.

**The Final Hearing and Appeal**

38. Doe appeared at the hearing but was not permitted proper access to his legal counsel.

39. The hearing panel consisted of Jackie Smalscheck, Mike Courtney and Rachel Kline, all University employees.

40. At the hearing, the panel heard statements from Doe and Jane. Doe was not permitted to cross examine Jane. Both parties were questioned by the panel.

41. Members of the panel made comments suggesting they entered the hearing having already found against Doe and evincing a bias in favor of female students. These comments include, but are not limited to, stating that a panel member was sorry that Jane "had to relive this" while she was proffering her testimony.

42. At the hearing, Jane gave testimony that seriously called into question the validity of the allegations made against Doe. Additionally, witnesses gave statements that directly contradicted previous statements yet the panel took no note of these discrepancies.

43. Doe has been denied access to any record of the panel's deliberations.

44. In correspondence dated December 11, 2021, Defendant notified Doe of the outcome of the investigation. The panel ruled that, by a preponderance of the evidence, Doe had not incapacitated Jane through the use of drugs or non-alcoholic substances.

45. Despite Doe raising the issue during his final hearing, it does not appear that Defendant considered that Jane testified she couldn't have been incapacitated on the amount of alcohol she drank and how that fact interacted with its conclusion that she had not been drugged. Essentially, by Jane's own admission, she could not have been incapacitated at the time of the allegations.

46. The panel ruled that Jane was incapacitated based almost exclusively on Doe's testimony that he himself was somewhat inebriated. This find evinces a clear double standard based on sex.

47. As a result of the panel's findings, Doe was to be suspended immediately from December 23, 2021 through August 15, 2022 with additional restrictions placed on Doe.

48. Doe appealed the panel's findings on multiple grounds to Office of Student Conduct Director Libby Spotts ("Spotts").

49. Spotts denied Doe's appeal with little explanation.

50. Defendant's processing of Jane's complaints, the investigation, final determination and appeal denied Doe due process of law.

51. Doe was not permitted effective access to counsel. While Doe was permitted to retain counsel, said counsel was forbidden from speaking on Doe's behalf and Doe was not permitted to communicate with his counsel while at investigative meetings and hearings. Counsel was likewise not provided reasonable access to the investigative file.

52. Doe was not permitted to properly cross examine witnesses.

53. Doe was not afforded an unbiased hearing or investigation. Throughout the process, Defendant evinced a marked bias in favor of women, both in what testimony they believed and the conclusions they chose to draw from available testimony and evidence.

54. Doe was not permitted full access to the evidence against him. Doe was only permitted to access the investigative file compiled by the Defendants during one strictly timed session and was not permitted to make copies of any of the contents.

55. Doe was not permitted access to the deliberations of the panel for purposes of drafting his appeal.

56. Defendant found against and suspended Doe because of his sex.

57. Defendant evinced a clear bias in favor of female witnesses and the female accuser.

58. Female witnesses and the accuser had their testimony largely taken at face value while Doe's testimony was disbelieved or taken out of context to be used against him.

59. The hearing panel made comments exemplifying their bias in favor of the female accuser during the hearing exemplifying the bias Doe alleges deprived him of due process.

60. Doe has suffered significant damages as a result of Defendant's unlawful violation of his rights including, but not limited to, loss of future opportunity, defamation, loss of future

income, denial of access to continued education, social ostracization, and mental and emotional distress such as depression and anxiety.

## COUNT I

## VIOLATIONS OF TITLE IX

61. Doe incorporates by reference all allegations contained in paragraphs 1-60 of this complaint.

62. Pursuant to 20 U.S.C. § 1681, Title IX is a federal statute designed to prevent sexual discrimination and/or harassment in educational institutions receiving federal funding.

63. Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination based on sex in a school's "education program or activity," which includes all of the school's operations. Title IX provides in pertinent part: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The United States Supreme Court has held that Title IX authorizes private suits for damages in certain circumstances.

64. Defendant Indiana University receives federal financial aid and is thus subject to these provisions.

65. Title IX includes an implied private right of action, without any requirement that administrative remedies, if any, be exhausted. An aggrieved plaintiff may seek money damages and other relief.

66. Title IX mandates Defendant Indiana University afford equitable procedures and

due process to Doe which includes, but is not limited to: (a) providing adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence, and/or (b) that Defendant employees involved in the conduct of the procedures have adequate training.

67. Upon information and belief, Defendant Indiana University knew, or in the exercise of due care should have known, employees received gender biased training regarding Title IX which caused them to violate Doe's Title IX rights in part by equating "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.

68. Defendant Indiana University's policies fail to meet the standards required by Title IX and/or Constitutional safeguards as interpreted by United States' courts regarding how institutions of higher education conduct disciplinary proceedings.

69. Upon information and belief, in virtually all cases of campus sexual misconduct by Indiana University students, the accused student is male and the accusing student is female.

70. Defendant's investigation and/or discipline of Doe is discriminatory and based upon or motivated by Doe's male gender.

71. The male gender discrimination by Defendant against Doe includes, but is not limited to, providing preferential treatment to the accuser. This preferential treatment includes, but is not limited to allowing her, but not Doe, the opportunity to review and respond to witness statements, present credibility witnesses, and attend and make a statement at the disciplinary hearing without having to respond to any questions.

72. Defendant Indiana University employees, including but not limited to Defendant, exhibited deliberate indifference by refusing to remedy: (a) Defendant's violations of Doe's

rights under Indiana University Policies, Title IX, and/or the Constitutions of the United States.

73. Defendant's deliberate indifference caused Doe to suffer sexual harassment and/or discrimination so severe, pervasive or objectively offensive that it deprived Doe of access to educational opportunities or benefits (and) caused other harms detailed above.

74. Defendant's actions and deliberate indifference caused Doe to suffer, and continue to suffer, damages.

## COUNT II

## VIOLATIONS OF THE FOURTEENTH AMENDMENT

75. Doe incorporates by reference all allegations contained in paragraphs 1-74.

76. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

77. Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

78. Defendant is considered a state actors that owes Doe certain protections pursuant to the Fourteenth Amendments to the United States Constitution and other Constitution provisions.

79. Defendant's conduct detailed in this Complaint violated Doe's Due Process rights in part by allowing anti-male bias to motivate their decision to deny Doe the "fundamentally fair [disciplinary] procedures" required by United States Supreme Court decisions such as Goss v. Lopez, 419 U.S. 565 (1975).

80. Even without the anti-male bias detailed in the Complaint, Defendant's conduct detailed above violated Doe's Due Process rights in part by denying Doe the "fundamentally fair

[disciplinary] procedures" required by United States Supreme Court decisions such as Goss v. Lopez, 419 U.S. 565 (1975).

81. Defendant's conduct detailed in this Complaint violated Doe's Due Process rights in part by irreparably damaging Doe's right to pursue an education and future educational and employment opportunities and occupational liberty. See e.g., Dixon v. Alabama State Board of Education, 294 F.2d 150, cert. denied, 368 U.S. 930, 82 S. Ct. 368, 7 L.Ed.2d 193 (1961)(stating, "[i]t requires no argument to demonstrate that education is vital and, indeed, basic to civilized society . . . [i]t is most unlikely that a public college would accept a student expelled from another public college of the same state. Indeed, expulsion may well prejudice the student in completing his education at any other institution. Surely no one can question that the right to remain at the college in which the plaintiffs were students in good standing is an interest of extremely great value.").

82. Defendant's conduct violated Doe's protected property interest in his education (and) right to pursue an education and future educational and employment opportunities and occupational liberty.

83. Defendant violated Doe's Due Process rights in part because Doe was denied a review by a gender-neutral and impartial decision maker.

84. Defendant violated Doe's Due Process rights in part because Doe was denied a "meaningful" opportunity to clear his name. See e.g., Matthews v. Eldridge, 492 U.S. 319, 333 (1976) (requiring disciplinary procedures that take place "at a meaningful time and in a meaningful manner.").

85. Defendant violated Doe's Due Process rights in part because Defendant prohibited

Doe from accessing information necessary for his defense and/or internal appeal.

86. Defendant violated Doe's Due Process rights in part because Defendant conduct evidenced arbitrary and/or irrational behavior that was not justified by any governmental interest.

87. Defendant violated Doe's Due Process rights in part because Defendant conduct was motivated by malice, ill will, bad faith, and/or an intent to injure Doe.

88. Defendant violated Doe's Due Process rights in part because they engaged in the arbitrary abuse of executive power so egregious that it shocks the conscience of the public. As evidence Defendant was, or should have been, aware that Defendant Indiana University had previously been warned about engaging in behavior that exhibits clear bias.

89. Defendant violated Doe's Due Process rights in part because Doe would not have been disciplined had Defendant acted in a gender-neutral manner.

90. Defendant violated Doe's Due Process rights in part because Defendant engaged in a gender-biased pattern and/or practice of disregarding and violating the rights of male students such as Doe when these males were accused of sexually assaulting a female student.

91. Defendant acted, or failed to act, under color of law, to deprive Doe's rights and privileges secured by the Fourteenth Amendment to the United States Constitution and other Constitution provisions.

92. Defendant's conduct evidenced an intentional, outrageous, and/or reckless disregard for Doe's constitutional rights.

93. Defendant's conduct towards Doe lacked any rational basis and/or was motivated by ill will or bad faith.

94. As a result of Defendant's Due Process violations, Doe was suspended

and suffers ongoing harm, including but not limited damage to his future educational and employment opportunities (and) and his standing and reputation which is marred in part by Defendant's unlawful finding that Doe engaged in sexual misconduct.

95. Defendant's investigation and/or discipline of Doe deprive Doe of his interests within the meaning of "life, liberty, or property" contained in U.S. Const. amend. XIV, § 1 in part because Defendant violated Doe's property right to a transcript unmarred by Defendant's unlawful investigation and/or discipline of Doe.

96. Upon information and belief, Defendant agreed to, approved, and/or ratified the various violations of Doe's Due Process rights detailed in this Complaint.

97. Defendant had actual or constructive knowledge that they were engaging in conduct creating a pervasive and unreasonable risk of deprivation of Doe's rights under the Fourteenth Amendments to the United States Constitution.

98. Because of Defendant's unlawful actions, Doe is entitled to injunctive relief that requires Defendant: (a) expunge Doe's official Indiana University student file of all information related his sexual encounter with Jane Doe; and (b) reinstate Doe as a Indiana University student.

99. Because of Defendant's unlawful actions, Doe is entitled to declaratory relief that requires Defendant: (a) expunge Doe's official Indiana University student file of all information related his encounter with Jane Doe; (b) be barred from disclosing Indiana University's aforementioned discipline of Doe to third parties in the future; and (c) reinstate Doe as a Indiana University student.

**REQUESTED RELIEF**

WHEREFORE, Plaintiff, John Doe, respectfully requests that this Court enter judgment

in his favor as follows:

1. Find and hold that Doe has suffered damages as a result of Defendant's unlawful conduct in violation of Title IX and Title VI;

2. Order Defendant to pay Doe, reinstate Doe, or pay him damages in lieu of;

3. Order Defendant to comply with requested injunctive relief;

4. Order Defendant to pay compensatory damages related to his loss of opportunity and income and emotional distress;

5. Order Defendant to pay punitive damages to Doe due to its reckless disregard and indifference to Doe's rights as protected by Title IX and Title VI;

6. Order Defendant to pay Doe pre- and post-judgment interest on all sums recoverable, and;

7. Award all other relief that is just and proper.

Respectfully submitted,

*s/ John H. Haskin*
John H. Haskin, Attorney No. 7576-49

*s/ Keenan D. Wilson*
Keenan D. Wilson, Attorney No. 32195-49

Attorneys for Plaintiff
John Doe

JOHN H. HASKIN & ASSOCIATES
255 North Alabama Street, 2nd Floor
Indianapolis, Indiana  46204
Telephone:   (317)955-9500
Facsimile:   (317)955-2570
Email:       jhaskin@jhaskinlaw.com
             kwilson@jhaskinlaw.com

## **DEMAND FOR JURY TRIAL**

Plaintiff, John Doe, by counsel, respectfully requests a jury trial for all issues deemed triable.

Respectfully submitted,

*s/ John H. Haskin*
John H. Haskin, Attorney No. 7576-49