UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO: 1:22-cv-00524-RLY-MG |
| | ) | |
| BOARD OF TRUSTEES OF | ) | |
| INDIANA UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT'S MEMORANDUM IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

STATEMENT OF MATERIAL  FACTS NOT IN DISPUTE...........................2

    I.    The University follows sex-neutral policies when responding to allegations of sexual misconduct..................2

    II.    The University's policy for releasing disciplinary records. .........................................................................5

    III.    Jane Doe reports the incident to the Office of Student Conduct and initial meetings take place with both parties.......................................................................5

    IV.    The investigatory team collects a wide range of information from both parties. ...........................................7

    V.    The case proceeds to the hearing phase. .............................9

    VI.    The panel's decision and John Doe's appeal.......................9

    VII.    John Doe serves the suspension and is readmitted to the University. ..................................................14

SUMMARY JUDGMENT STANDARD ...................................................15

ARGUMENT ....................................................................................16

    I.    John Doe's Title IX claims fail because he cannot point to any evidence of sex discrimination. ...............................17

    II.    The University is entitled to summary judgment on John Doe's Fourteenth Amendment claims for several reasons. ........................................................................19

        A.    John Doe's Fourteenth Amendment claims are barred by the Eleventh Amendment.........................20

        B.    John Doe has no cognizable property interest in receiving an education from the University. .............21

        C.    John Doe has no cognizable liberty interest to assert in this case. ..................................................21

        D.    John Doe's Fourteenth Amendment claims also fail because the University provided him a meaningful opportunity to be heard.........................24

    III.    The remedies John Doe seeks are unavailable to him........25

CONCLUSION ..................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abcarian v. McDonald*,
    617 F.3d 931 (7th Cir. 2010) ......................................................22, 23

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ...................15

*Billups v. Methodist Hosp. of Chicago*,
    922 F.2d 1300 (7th Cir.1991)............................................................16

*Bissessur v. Ind. Univ. Bd. of Trs.*,
    581 F.3d 599 (7th Cir. 2009) ............................................................21

*Carmody v. Board of Trustees of Univ. of Illinois*,
    893 F.3d 397 (7th Cir. 2018) ............................................................19

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)................16, 19

*Charleston v. Bd. of Trs. of Univ. of Ill. at Chicago*,
    741 F.3d 769 (7th Cir. 2013) ..................................................20, 21, 24

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
    142 S. Ct. 1562 (April 28, 2022) ......................................................25

*de Lima Silva v. Dep't of Corrs.*,
    917 F.3d 546 (7th Cir. 2019) ............................................................20

*Doe v. Bd. of Trustees of Univ. of Illinois*,
    No. 17-CV-2180, 2018 WL 11269804 (C.D. Ill. July 24,
    2018)..............................................................................................23

*Doe v. Columbia Coll. Chi.*,
    933 F.3d 849 (7th Cir. 2019) ............................................................17

*Doe v. Purdue Univ.*,
    928 F.3d 652 (7th Cir. 2019) ..................................................17, 23, 24

*Doe v. Trustees of Indiana Univ.*,
    496 F. Supp. 3d 1210 (S.D. Ind. 2020)..........................................22, 23

*Hansen v. Bd. of Trustees for Hamilton Se. Sch. Corp.*,
    522 F. Supp. 2d 1101 (S.D. Ind. 2007)..............................................15

*Hayden v. Greensburg Comm. Sch. Corp.*,
    743 F.3d 569 (7th Cir. 2014) ..........................................................17

*Hess v. Bd. of Trs. of S. Illinois Univ.*,
    839 F.3d 668 (7th Cir. 2016) ..........................................................24

*Johnson v. Marian Univ.*,
    829 F. App'x 731 (7th Cir. 2020) ....................................................17

*Khan v. Bland*,
    630 F.3d 519 (7th Cir. 2010) ..........................................................22

*Linwood v. Bd. of Educ. of the City of Peoria*,
    463 F.2d 763 (7th Cir. 1972) ......................................................... 24

*Paul v. Davis*,
    424 U.S. 693, 711 (1976)................................................................22

*Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*,
    510 F.3d 681 (7th Cir. 2007) ..........................................................20

*Ripberger v. Western Ohio Pizza, Inc.*,
    908 F.Supp. 614 (S.D. Ind. 1995) .................................................. 16

*Thomas v. Illinois*,
    697 F.3d 612 (7th Cir. 2012) ......................................................... 20

*Williams v. Wendler*,
    530 F.3d 584 (7th Cir. 2008) ......................................................... 21

*Williamson v. Ind. Univ.*,
    345 F.3d 459 (7th Cir. 2003) ......................................................... 20

**Statutes**

20 U.S.C. § 1681(a) ...........................................................................17

20 U.S.C. §1681, et seq. .....................................................................1

42 U.S.C. § 1983 ..........................................................................19, 20

Ind. Code § 21-27-4-2 .........................................................................1

University.................................................................................*passim*

**Other Authorities**

Eleventh Amendment ........................................................................16, 20

Federal Rule of Civil Procedure 56 ..................................................... 1, 15

United States Constitution Fourteenth Amendment......................*passim*

The Trustees of Indiana University ("University") [1], through counsel, files this memorandum in support of its motion for summary judgment under Federal Rule of Civil Procedure 56.

## INTRODUCTION

In the Summer of 2020, Jane Doe reported that John Doe[2] sexually assaulted her in his off-campus apartment. In the months following the report, the Office of Student Conduct ("Office"), pursuant to University's applicable policies and procedures, conducted a comprehensive investigation into the allegations. After a careful review of the information contained in the investigation file and presented during a hearing, an impartial panel concluded that John Doe violated Section I2(d) of the University's Conduct Code by engaging in non-consensual sexual activity with Jane Doe. This decision was upheld after an internal appeal. In response, John Doe sued the University under Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, et seq., and for violating the Fourteenth Amendment to the United States Constitution.

The University is entitled to summary judgment on all of John Doe's claims. The undisputed evidence shows that the University went out of its way to ensure that John Doe's rights were upheld during the proceedings. John Doe participated in every phase of the investigation process. He was

---

[1] The proper name for Defendant is "The Trustees of Indiana University," see Ind. Code § 21-27-4-2, ("University").

[2] This Court ordered the parties to adopt the pseudonym "John Doe" for Plaintiff and the pseudonym Jane Doe to refer to the complainant in the underlying disciplinary proceeding. [Dkt. 16]

treated impartially and suffered no disadvantage because of his sex. John Doe was given ample opportunity to present evidence, submit statements, submit questions, and identify witnesses. Further, an unbiased panel, after a thorough assessment of the facts, reached a fair decision – a decision which was reviewed and upheld after an internal appeal.

## STATEMENT OF MATERIAL  FACTS NOT IN DISPUTE

**I.    The University follows sex-neutral policies when responding to allegations of sexual misconduct.**

The  Office is tasked with investigating reports of student misconduct – including reports involving sexual misconduct allegations. [Ex A., Struble Aff., ¶ 3.] Upon receipt of a report, an initial meeting takes place with the complainant to discuss the report, review the Complainant Information Form and investigatory process, and to decide whether they wish to move forward with the University's process. [Ex. B., Struble Dep. at pg. 18:1-18.] If the student elects to move forward, the Office will notify the respondent that a report has been made that includes allegations regarding their behavior. [*Id.* at pg. 23:6-13, pg. 25:11-24.] The investigators will then meet with the respondent to discuss the investigatory process, review the Complainant Information Form, and discuss supportive measures that are available to students. [*Id.* at pg. 26:10-27:6.] Both students are informed of their right to have an advisor present during the investigation. [*Id.* at pg. 26:22-23, 52:16-53:11.]

After these initial meetings, the Office begins its investigation. The investigation may include interviews with the complainant, the respondent, and other witnesses identified as having relevant information. [*Id.* at pg. 31:1-32:3.] Both complainant and respondent are able to present witnesses of their own choosing. [*Id.*] Further, the investigators may examine written statements, review documents submitted by the parties, or other forms of relevant information. [*Id.*] The investigators will then draft a preliminary investigation report. [*Id.* at pg. 35:3 – 36:1.] The parties are given ten days to review the report and to provide any clarifying information. [*Id.*] The investigators then determine whether charges are appropriate. [*Id.* at pg. 37:1-38:2.] Sometimes, an investigation may uncover facts that render a hearing unnecessary. [*Id.*] But if no dispositive information is uncovered, a final investigation report is drafted and a hearing panel is formed. [*Id.*] This report is provided to the parties and their advisors before the scheduled sexual misconduct hearing. [*Id.* at pg. 37:24-38:2.]

The panel members are drawn from a pool of faculty, staff, and graduate students who completed the university's required training on issues related to sexual misconduct and university policies and procedures. [Ex C., Spotts Dep. pg. 59:2-6; Ex D., Stelmaszczyk Dep. pg. 12:17-13:17; Ex E., Ronald Dep. pg. 10:24-11:10;  Ex F., Courtney Dep. pg. 9:14-11:18.] They are trained to evaluate the evidence without preconceived notions about the complainant or the respondent. [Ex. D. Stelmaszczyk Dep. pg. 21:22-22:5; Ex F., Courtney Dep. pg. 16:4-18.]

At the beginning of the hearing, the panel chair introduces themselves and summarizes the hearing procedures. [Ex. D. Stelmaszczyk Dep. pg. 37:1-38:6.] During the proceedings, both parties are able to make remarks. [Id. at pg. 38:9-39:2.] Those remarks are generally followed by questions from the panelists. [Id.] The complainant and respondent may ask questions by submitting them to the hearing chair, who then poses them to the other party. [Ex C., Spotts Dep. pg. 48:23-49:17; Ex. D. Stelmaszczyk Dep. pg. 17:5-18:5.] The Chair reviews the questions and excludes those that are irrelevant or otherwise impermissible. [Ex. D. Stelmaszczyk Dep. pg. 41:8-15.] The panelists also hear from the witnesses identified by the parties. [Id. at pg. 39:18-24.] The parties also have an opportunity to ask questions directly to the investigators. [Id. at pg. 41:23-42:6.]

The panelists deliberate in private after the hearing to determine whether the evidence supports a finding of responsibility for the specific charges. [Ex. D. Stelmaszczyk Dep. pg. 43:11-18; Ex C., Spotts Dep. pg. 31:14-19.] The panelists use a preponderance standard, meaning that a student will be found responsible if the evidence shows that it is more likely than not that they were responsible for the alleged violations. [Ex C., Spotts Dep. pg. 49:20-50:14.] If the student is found responsible, the panel will propose sanctions which will be reviewed by a sanctioning official to ensure that the sanctions are appropriate. [Id. at pg. 31:14-32:4.] These

proposed sanctions are then reviewed by another University official to ensure that the sanctions are proportional to the violation and consistent with the University's standards. [*Id.*] Both the respondent and the complainant can appeal the decision. [*Id.* at pg. 71:3-13.]

## II.   **The University's policy for releasing disciplinary records.**

A student may serve a suspension as a sanction based on the panel's decision. When a student serves a suspension, it is only notated on their transcript during the duration of their suspension. [Ex C., Spotts Dep. pg. 56:10-21.] When students complete their suspension, that notation is removed from their transcript. [*Id.*] The University will only release information about a student's suspension if that student grants the University authority to do so. [*Id.* at pg. 57:5-58:11.] If the University receives such a request, and there is a waiver on file, the University will release what is called a Dean's Form. [*Id.*] The form provides standard information about a student's disciplinary record. [*Id.*] It includes the student's name, date of birth, and briefly explains their disciplinary history. [*Id.*]

## III.   **Jane Doe reports the incident to the Office of Student Conduct and initial meetings take place with both parties.**

In June 2020, Jane Doe contacted the Office of Student Conduct ("Office") and expressed her desire to make a formal report of sexual misconduct. [Ex B., Struble Dep. pg. 57:6-10; Ex. G, Preliminary Inv. Report, pg. 1; Ex H. Final Inv. Report, pg. 1.] After receiving the report, the Office assembled a team of three University officials to investigate the report; Taylor Struble assumed the lead role in the investigation, with Simone

Cardosa and Laura Mals rounding out the team of investigators. [Ex. G, Preliminary Inv. Report, pg. 1; Ex H. Final Inv. Report, pg. 1.]

On June 22, 2020, Jane Doe and her advisor, met with investigators Struble and Cardosa via Zoom video conference for an initial meeting. [Ex. G, Preliminary Inv. Report pg. 1; Ex H. Final Inv. Report, pg. 1.] Jane Doe stated that John Doe sexually assaulted her at his off-campus apartment during the summer of 2020. [Id. at pg. 1-8.] She stated that John Doe engaged in several non-consensual sexual acts while she was incapacitated. [Id.] During this meeting, the investigators gave Jane Doe the Complainant Information Form which provided information about the University's investigatory process, and resources available to help her decide whether to move forward with the complaint. [Ex B., Struble Dep. pg. 55:19 – 56:22; Ex. G, Preliminary Inv. Report, pg. 1-2; Ex H. Final Inv. Report, pg. 1-2.]

On July 6, 2020, John Doe received a letter from Struble that provided notice of the allegations against him and invited him to attend a meeting with the team of investigators. [Ex. I. John Doe Notice Letter; Ex. J, John Doe Dep, pg. 24:15-24:23; Ex B., Struble Dep. pg. 68:1-6]. This initial notice summarized the allegations, included links to the University's sexual misconduct policy and procedures, and links to resources for students. [Ex. I, John Doe Notice Letter.] Two days after Struble delivered the notice, John Doe and his advisor, attorney Roy Graham, met with Struble and Cardosa via Zoom video conference. [Ex. G, Preliminary Inv. Report,

pg. 9; Ex H. Final Inv. Report, pg. 9.] The investigators provided John Doe a copy of the Respondent Information Form which he signed. [Ex J, John Doe Dep. pg. 29:11-18; Ex. H, Inv. Report, pg. 46.] During the initial meeting, John Doe was apprised of the investigatory process and rules. [Ex. J., John Doe Dep. pg. 28:2-15.] John Doe walked away from the initial meeting with an understanding of the University's procedures for responding to allegations of sexual misconduct. [Id. at pg. 29:19-30:11.]

### IV. The investigatory team collects a wide range of information from both parties.

The investigation took place over several months. The investigative team gathered materials submitted by both parties, which were incorporated into both the preliminary and final investigation reports. John Doe and Jane Doe identified witnesses, submitted written statements, presented information, and submitted other types of evidence.

The investigators received the following information from Jane Doe which they later included in the investigation reports: a written statement that summarized her allegations [Ex. H, Final Inv. Report, pg. 38.]; three verbal statements during meetings with the investigatory team [Id. at pg. 36-37,39-40,41-43.]; location data on the night of the incident [Id. at pg. 138.]; a series of text messages [Id. at pg. 109-117.]; and medical documentation from a visit with a Sexual Assault Nurse Examiner which took place shortly after the incident. [Id. at pg. 145-155.]

John Doe submitted the following information which was later included in the investigation reports: the identity of a witness who was present on the night of the incident [Ex. J, John Doe Dep. pg. 32:12-33:5, 40:24-41:10]; three written statements that either summarized his version of the incident or clarified his previous statements [Ex. J, John Doe Dep. pg. 44:4-15; Ex. H, Final Inv. Report, pg. 49-50, 51, 52-59.]; three verbal statements during meetings with the investigatory team [Ex. H, Final Inv. Report, pg. 47, 60, 64]; a series of text messages between him and Jane Doe; photographs of his apartment [Id. at pg. 118]; results of a polygraph examination [Id. at pg. 156.]; and the polygraph examiner's resume [Id. at pg. 159]. The investigatory team interviewed six witnesses that the parties identified, along with receiving and reviewing several documents from those witnesses. [Id. at pg. 87-105, 107-108, 125-135.]

The investigators then drafted a preliminary investigation report based on the information they gathered. [Ex. A, Struble Aff., ¶ 7; Ex. G, Preliminary Inv. Report.] This report was a compilation of all the relevant information that was gathered during the investigation. The parties were given ten days to review the report and provide any clarifying information. [Ex. J, John Doe Dep. Pg. 54:4-7.]

The investigatory team opted to redact specific information related to prior misconduct allegations made against John Doe. [Ex B., Struble Dep. pg. 108:17-110:11; Ex K., Mals Dep. Pg. 24:11-25:9.] The investiga-

tory team redacted portions of the report as part of its procedures. [Compare Ex. L, Original Witness Notes, pg. 2-3; Ex. H, Final Inv. Report, pg. 102-103.] One of the witnesses reported that John Doe directed them not to mention a prior allegation made against John Doe while he was in high school. [Ex. L, Original Witness Notes, pg. 2-3; Ex. J, John Doe Dep. pg. 94:3-96:17.] The investigators decided to redact mention of these exchanges from the final report so that it would not be shared with the hearing panel. [Ex B., Struble Dep. pg. 110:1-11.]

**V.     The case proceeds to the hearing phase.**

The final report was released to the parties for review before the hearing. [Ex. J, John Doe Dep. Pg. 67:1-68:15; Ex B., Struble Dep. Pg. 37:24 – 38:2.] The final report was also released to the hearing panelists. [Ex. B., Struble Dep. Pg. 44:11-16; Ex. F., Courtney Dep. Pg. 34:8-20.] At the hearing, the parties were invited to submit questions to the hearing chair to be asked to the other party, but they are not permitted to directly question the other party. [Ex. C., Spotts Dep. pg. 48:23-49:17; Ex. D. Stelmaszczyk Dep. pg. 17:5-18:5; Ex. J, John Doe Dep. pg. 43:8-14.] The parties, however, were able to ask questions directly to the witnesses. [Ex. J, John Doe Dep. pg. 41:13-18.]

**VI.    The panel's decision and John Doe's appeal**

The hearing panel determined that John Doe was responsible for violating I2(d) of the Code of Student Rights, Responsibilities, and Conduct. [Ex. M, John Doe Outcome Letter]. He was found responsible for

engaging in non-consensual sexual activity while Jane Doe was incapacitated, including kissing her, touching and kissing her breasts, digitally penetrating her vagina, and contacting her vagina with his penis. [Ex. C, Spotts Dep. pg. 52:13-22; Ex. M, John Doe Outcome Letter]. The panel determined that the preponderance standard was not met to support a finding that John Doe drugged Jane Doe to induce her incapacitation. [Ex. C., Spotts Dep. pg. 52:23-53:5; Ex. M., John Doe Outcome Letter]. The panel also determined that the preponderance standard was not met to support a finding of non-consensual oral penetration. [Id.]

The panel's rationale for its decision was fully explained within the outcome letter that was delivered to John Doe on December 11, 2020. [Ex. J, John Doe Dep. pg. 70:5-72:3; Ex. M, John Doe Outcome Letter]. John Doe received a copy of the outcome letter which included the panel's reasoning for finding him responsible.[Id.] The following explanation for the hearing panel's decision was included in the letter[3]:

> Regarding incapacitation, Complainant stated in the file that she recalls consuming 3 glasses of wine, and that together she and Respondent consumed one and a half bottles of wine prior to her losing memory. Complainant stated in the hearing that they drank wine out of a "large glass" typically used to serve red wine and that each of the three glasses was poured 3/4 of the way full. Complainant stated in the hearing that she also poured herself and Respondent a glass of wine, which emptied the first bottle of wine and did not count in her recollection of "full" glasses of wine she consumed. Respondent stated in the file and the hearing that he and Complainant consumed the

---

[3] For clarity, the Complainant referenced in the outcome letter is Jane Doe and the Respondent is Plaintiff John Doe.

same amount of wine. Respondent stated in the hearing that he believes they consumed two bottles of wine between the two of them. Based on the information in the case file and the hearing from Complainant and Respondent, Respondent observed Complainant consume all of her drinks. Witness 2 stated in the file that he observed two empty wine bottles after the reported incident.

Respondent stated in the file and hearing that he and Complainant consumed approximately the same amount of alcohol and that he felt "tipsy." Respondent stated in the hearing that while in his living room and before going upstairs to his bedroom, Respondent noticed that he was feeling the effects of the alcohol because he felt his eyes become irritated, and "it was kind of a fuzzy feeling." Respondent stated in the hearing that he observed himself to be intoxicated while in his bedroom with Complainant while Complainant was completing the calculus problem. Respondent stated that he remembers looking at the calculus problem and did not know how to complete it, which led to him to know he was intoxicated. Respondent stated in the file and the hearing that he asked Complainant if she was "ok" or "fine" throughout the night, including when Respondent stated Complainant initiated kissing on the couch and when unclothed in bed, and that each time he asked Complainant stated "yes." Respondent was not able to articulate in the hearing what he observed beyond this, or what "ok" or "fine" would mean or look like to indicate that Complainant was able to provide consent and was not incapacitated. In the text messages provided in the file, Respondent stated to Witness 5 that he discussed a "drunk test" with Complainant on this night which included Respondent's ability to do "orgo" and Complainant being able to do Calculus. Respondent stated in the file and hearing that he discussed calculus with Complainant on this night which led to Complainant and Respondent going to Respondent's room to complete a Calculus problem before going back downstairs. Respondent stated in the hearing that a "drunk test" is "if I can still do it, then I'm not drunk." Complainant stated in the hearing that she does not remember any conversation of a "drunk test," her "drunk test" being to perform calculus, or hearing the phrase "drunk test." The panel considered that Respondent was evaluating Complainant's intoxication by asking if she was "ok" or "fine" and by discussing a "drunk test," and that this evaluation occurred after he had made observations about his own intoxication from the consumption of alcohol, and he determined that he was feeling the effect of alcohol consumption.

Witness 1 stated in the file and the hearing that when picking Complainant up from Respondent's house, Complainant was fully undressed and uncovered in the bed, and was lying face down. Witness 1 stated in the file and hearing Complainant was not alert and could not easily be woken, could not speak full or clear sentences when woken, could not dress herself, could not walk without assistance, was not able to discern the direction she should be walking to get to the vehicle to go home, and that her eyes appeared "lifeless." Witness 1 stated that Complainant was "aggressive" in her speech and actions towards Witness 1, which she noted to be out of character from any of the many times she has seen Complainant intoxicated. Text messages included in the case file between Complainant and Witness 3 show that Complainant was not able to type coherent words or sentences. Witness 3 stated in the file and hearing that Complainant was fully undressed and uncovered in the bed. Witness 3 stated in the file and hearing that Complainant was not able to text coherent statements, and observed that Complainant needed assistance walking and using the stairs, was not able to speak in full or clear sentences, and needed assistance getting into the vehicle to go home.

Respondent stated in the hearing that after Complainant "pushed" or "shoved" her breasts towards his face, he stopped all activity by asking Complainant to move from on top of him and he went to the bathroom for 1-2 minutes, then returned to his room where he observed Complainant laying on the bed, "sprawled out," with one shoulder on the bed and her legs extended. Respondent stated in the hearing Complainant looked like she "was ready to go to bed" and he said "let's go to bed." Respondent stated in the file that Complainant was sitting up in bed when he went to the bathroom, and when he returned Complainant was laying on the bed and appeared to be "sleepy" with "droopy" eyes. Respondent stated in the hearing that he fell asleep for 2-3 minutes before hearing Complainant's phone continuously ring, attempting to wake Complainant multiple times, and then texting Witness 1 from Complainant's phone that he could not wake Complainant.

Based on Respondent's statements in the hearing that he was able to observe his own intoxication from alcohol, Respondent's statements in the file and hearing that he observed Complainant consume approximately the same amount of alcohol as he did, Respondent's statements in the file and hearing that Complainant and Respondent consumed two bottles of wine together, and Respondent's statements in the hearing that

there was approximately 5 minutes between sexual activity and being unable to wake Complainant to consciousness, the panel determined that, based on the preponderance of the evidence, Complainant was incapacitated, and Respondent knew or should have known that she was unable to provide consent.

Regarding digital penetration of Complainant's vagina by Respondent, Respondent stated in the file that this did not occur and in the hearing that this may have occurred. Complainant submitted results from a forensic exam from the day after the reported incident showing there were abrasions; Complainant stated in the file that a nurse told her the abrasions may be caused by fingernails. Witness 2 stated in the file that Respondent told him immediately after the reported incident occurred that Respondent "may have" digitally penetrated Complainant. The panel finds Witness 2 to be credible because he overheard different parts of the incident from his room and informed Respondent of what he heard, like overhearing Complainant hitting her head. Respondent confirmed he spoke with Witness 2, and Witness 2 could recall the conversation that occurred immediately after the reported incident. Based on the information included in the forensic exam, Respondent's inconsistent statements about whether the behavior did or may have occurred, and Witness 2's statement that Respondent informed him it may have occurred, the panel determined that it is more likely than not that digital penetration of Complainant's vagina by Respondent occurred. Additionally, based on medical documentation that abrasions did exists on Complainant's vagina, and statements from Respondent in the file and the hearing that he did not digitally penetrate Complainant's vagina and his later statement that this may have occurred, the panel did not determine Respondent's statements regarding this behavior to be credible.

Regarding sexual contact of Complainant's vagina by Respondent with his genitals, Respondent stated in the file that Complainant and Respondent were unclothed while in his bed and Complainant was on top of Respondent. Respondent stated in the file that Complainant "was not sitting on my stomach." Respondent stated in the hearing that Complainant was sitting lower than his stomach and above his genitals, on his pelvis. When asked if his penis was erect during this interaction, Respondent stated "probably, yes." Respondent stated in the file that there was not penetration of Complainant's vagina with his penis and that he did not contact Complainant's vagina. Respondent stated in the hearing that there

13

was no penetration of Complainant's vagina with his penis, that he was "not sure" if there was contact of his penis to Complainant's vagina, and that his penis did not touch Complainant's body. Respondent stated in the file that he doesn't remember any contact with Complainant besides kissing her on the lips. Respondent stated in the hearing that there may have been kissing of Complainant's neck by Respondent and that it was possible that there was digital penetration by Respondent. Respondent also stated in the file that it was possible that Complainant and Respondent's genitals did touch during the reported incident. Regarding sexual contact of Complainant's vagina by Respondent with his genitals without consent while Complainant was incapacitated, the panel determined that the preponderance was met that this did occur....

Based on these findings, the panel recommended a one and a half year suspension. [Ex C, Spotts Dep. Pg. 53:6-17; Ex. M, John Doe Outcome Letter]. On December 11, 2020, Libby Spotts informed John Doe of the panel's decision and outlined his right to appeal. [Ex J, John Doe Dep. Pg. 71:5-72:3; Ex. M, John Doe Outcome Letter.] John Doe appealed the panel's decision. [Ex J, John Doe Dep. Pg. 73:17-74:3; Ex. N, John Doe Appeal.] The panel's decision was upheld on review by Dr. Kathy Adams Riester who served as the appellate officer. [Ex. O, Appeal Outcome Letter]

## VII.  John Doe serves the suspension and is readmitted to the University.

The terms of John Doe's suspension outlined specific requirements for his re-enrollment with the University once the suspension term was completed. [Ex C., Spotts Dep. pg. 54:16-55:2; Ex. N, John Doe Outcome Letter; Ex. O, Appeal Outcome Letter.] These requirements included attending a re-entry meeting, participating in counseling, and confirming his attendance at counseling sessions. *Id.* These steps were aimed to ensure

that John Doe would glean valuable insights from his experience, particularly in the areas of decision-making, maintaining appropriate boundaries, understanding consent, and fostering healthy relationships. *Id.* John Doe completed these steps and is currently enrolled with the University and is in good standing. His expected graduation date is May 2024. [Ex. J, John Doe Dep. pg. 9:22-10:4.] John Doe has not yet applied to graduate school but he intends to do so at a later date. [*Id.* pg. 87:4-17.]

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when there is no genuine dispute over material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual dispute is material only when the dispute could affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute over a non-dispositive factual issue will not preclude summary judgment. *Id.* A factual dispute is genuine if the evidence presented by the party opposing summary judgment could lead a reasonable jury to return a verdict for the non-moving party. *Id.* A genuine factual dispute cannot rest on conclusory allegations but must be supported by admissible evidence that sufficiently demonstrates a triable issue. *Id.* at 248-49.

The nonmoving party has the burden of showing that a genuine issue of material fact exists. *Hansen v. Bd. of Trustees for Hamilton Se. Sch. Corp.*, 522 F. Supp. 2d 1101, 1103 (S.D. Ind. 2007). The non-moving party

cannot rest on its pleadings, but must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *Billups v. Methodist Hosp. of Chicago,* 922 F.2d 1300, 1302 (7th Cir.1991). If the non-moving party fails to make a sufficient showing on an issue for which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *Ripberger v. Western Ohio Pizza, Inc.*, 908 F.Supp. 614, 617 (S.D. Ind. 1995) (citing Celotex Corp., 477 U.S. at 323).

## ARGUMENT

There is simply no evidentiary basis for John Doe's allegation that he was the victim of sex-based discrimination or that he was not afforded due process. Thus, the University is entitled to summary judgment on all of John Doe's claims.

The undisputed material facts show that the Office followed its sex-neutral policies and conducted an impartial, fair, and thorough investigation into the allegations. The hearing panel reached a decision grounded in sound reasoning, which was upheld after review by an impartial third party. John Doe's Title IX claim relies on allegations that are unfounded, purely speculative, and ultimately unsupported by concrete evidence.

John Doe's due process claims fail as well. As an initial matter, the University is immune from this claim under the Eleventh Amendment. Immunity on its own is an adequate basis to grant summary judgment for the University. Even if immunity did not apply, the undisputed evidence shows that the University's actions did not deprive John Doe of life, liberty,

16

or property. And even if it did, he was afforded a level of due process that stands up to scrutiny under the Fourteenth Amendment. Therefore, all of John Doe's claims must fail and the University is entitled to summary judgment.

**I.    John Doe's Title IX claims fail because he cannot point to any evidence of sex discrimination.**

Title IX prohibits universities that receive federal funds from discriminating against students on the basis of sex. 20 U.S.C. § 1681(a). Other circuits have adopted various tests for Title IX claims stemming from university disciplinary proceedings. *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019). But the Seventh Circuit's inquiry focuses on a simple question: Did the University discriminate against the plaintiff because of their sex? *Id.* To succeed on his Title IX claim, John Doe must show that the University discriminated against him because of his sex. *Id.*; see also *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854-55 (7th Cir. 2019). Conclusory allegations of bias alone are not enough; John Doe must provide concrete evidence demonstrating that, in this particular instance, the University treated him differently because of his sex. *Johnson v. Marian Univ.*, 829 F. App'x 731, 732 (7th Cir. 2020). Further, he must show that the discrimination was intentional to succeed. *Hayden v. Greensburg Comm. Sch. Corp.*, 743 F.3d 569, 583 (7th Cir. 2014).

In his complaint, John Doe alleges that the University's employees receive biased training. [Dkt. 1, Pls. Compl., ¶ 67.] He also alleges that the Office's investigation procedure was tainted by sex bias. [*Id.* at ¶ 70.] These

17

allegations are simply not true. John Doe cannot point to any evidence suggesting the training or proceedings were biased, because none exists. The investigators and hearing panelists all received hours of training which never suggests that a person should be given preferential treatment based on their sex. [Ex. C, Spotts Dep. Pg. 59:2-6; Ex. D, Stelmaszczyk Dep. Pg. 12:17-13:17; Ex. E, Ronald Dep. Pg. 10:24-11:10; Ex. F, Courtney Dep. Pg. 9:14-11:18.] Further, both parties were treated fairly during the investigation and hearing. Both were promptly notified of the investigation and engaged with investigators early to ensure they fully understood the procedures. [Ex. I, John Doe Notice Letter.] The parties actively participated in the investigation by identifying witnesses, submitting relevant documents, making multiple statements to investigators, and by posing questions throughout the process. [See Supra Pg. 7-8: § IV.] This information was gathered in the initial and final investigation reports which were accessible to the parties before the hearing. [Ex. J, John Doe Dep. Pg. 67:1-68:4; Ex B, Struble Dep. Pg. 37:24 – 38:2.]

The investigators took additional discretionary measures to ensure a fair process for John Doe. During the investigation, it surfaced that John Doe asked one of the witnesses not to discuss an incident from his hometown before he enrolled at the University. [Ex. J., John Doe Dep. pg. 94:3-96:17; Ex B, Struble Dep. Pg. 108:17-110:11; Ex. K, Mals Dep. pg. 24:11-25:9.] The investigators decided to redact certain references to the hometown incident and John Doe's request to the witness not to disclose

this incident to investigators. [Compare Ex. L, Witness Notes; Ex. H, Final Inv. Report, pg. 94-95, 102-103.] By making these redactions, the hearing panel remained unaware of these specific incidents. [Ex. B, Struble Dep. Pg. 108:17-110:11.] The investigators decided to redact the incidents to prevent them from diverting the panelists' focus from their primary task of determining whether misconduct had occurred in the case under consideration. [*Id.*] This is not a sign of bias against John Doe, rather it shows the investigators made diligent and painstaking efforts to ensure the process was fair to him.

Summary judgment is appropriate when the non-moving party produces no proof to establish an element essential to their case and upon which they bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). John Doe, as the non-moving party is entitled to all reasonable inference to be drawn in his favor, but those inferences must be supported by more than speculation or conjecture to defeat a summary judgment motion. *Carmody v. Board of Trustees of Univ. of Illinois*, 893 F.3d 397, 401 (7th Cir. 2018). Because he cannot show evidence of sex bias, this Court should grant summary judgment in the University's favor.

## II.    The University is entitled to summary judgment on John Doe's Fourteenth Amendment claims for several reasons.

John Doe seeks to hold the University liable under 42 U.S.C. § 1983, alleging that the University deprived him of his Fourteenth Amendment

due process rights. The Fourteenth Amendment to the United States Constitution says the state "shall [not] deprive any person of life, liberty, or property, without due process of law." Under the Fourteenth Amendment, the University only owed John Doe due process if the proceedings deprived him of life, liberty, or property; "There are two steps to any procedural due process analysis. First, the court must identify the protected property or liberty interest at stake. Second, it must determine what process is due under the circumstances." *Charleston v. Bd. of Trs. of Univ. of Ill. at Chicago*, 741 F.3d 769, 772 (7th Cir. 2013).

## A.   **John Doe's Fourteenth Amendment claims are barred by the Eleventh Amendment.**

The Eleventh Amendment bars actions in federal court against a state and its agencies. *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 695 (7th Cir. 2007). It is settled that "[t]he Eleventh Amendment bars private litigants' suits against nonconsenting states in federal courts, with the exception of causes of action where Congress has abrogated the states' traditional immunity through its powers under the Fourteenth Amendment." *de Lima Silva v. Dep't of Corrs.*, 917 F.3d 546, 565 (7th Cir. 2019). Congress has not abrogated the immunity of the states in § 1983 suits and the University asserted its immunity by raising it as an affirmative defense in its answer to the complaint. [Dkt. 15, Def. Ans., pg. 23]; *Thomas v. Illinois*, 697 F.3d 612, 613 (7th Cir. 2012).

The University is also not an appropriate defendant in a Section 1983 action because the State of Indiana is not a "person" who can be

sued for damages under 42 U.S.C. § 1983. *Williamson v. Ind. Univ.,* 345 F.3d 459, 464 (7th Cir. 2003). And like the Plaintiff in *Williamson*, John Doe only named the University as a defendant; he joined no individual defendants that participated in the investigation, hearing, or appeal. 345 F.3d 459, 463.

This Court can grant summary judgment for the University on John Doe's Fourteenth Amendment claims on these grounds alone. That said, even if the University never asserted immunity as a defense, John Doe still cannot succeed in his Fourteenth Amendment claim because no property or liberty interest is at stake.

**B.     John Doe has no cognizable property interest in receiving an education from the University.**

John Doe does not have an independent property interest in an education at a state university. *Charleston v. Bd. of Trs. of Univ. of Ill. at Chicago*, 741 F.3d 769, 772 (7th Cir. 2013); see *also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 601 (7th Cir. 2009); *Williams v. Wendler*, 530 F.3d 584, 589 (7th Cir. 2008). The Seventh Circuit has repeatedly reaffirmed that conclusion, as a contrary result "would imply that a student who flunked out would have a right to a trial-type hearing on whether his tests and papers were graded correctly and a student who was not admitted would have a right to a hearing on why he was not admitted." *Charleston*, 741 F.3d at 773.

**C.     John Doe has no cognizable liberty interest to assert in this case.**

John Doe's other chance for showing that the Due Process Clause is implicated is to show that the University deprived him of a "liberty interest." Plaintiff's only possible claim on this basis would be to invoke the "stigma plus" test. The undisputed facts show that the University did not deprive John Doe of a liberty interest.

The Seventh Circuit recognizes that a valid liberty interest is implicated when a person's name, reputation, and honor is called into question, thus making it impossible to find employment in one's chosen field. *Khan v. Bland*, 630 F.3d 519, 535 (7th Cir. 2010). Yet even defamation by the government does not deprive a person of a protectable liberty interest, even when it causes serious impairment of one's prospects. *Khan*, 630 F.3d at 534. To avoid constitutionalizing state defamation law, defamation by a government actor does not implicate the due process clause unless "a right or status previously recognized by state law was distinctly altered or extinguished' as a result." *Abcarian v. McDonald*, 617 F.3d 931, 941 (7th Cir. 2010) (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976))

To succeed under this "stigma-plus" theory, John Doe must prove three things: (1) that the University disclosed information to the public that damaged his reputation, (2) that the reputational harm made it impossible for him to find employment in his chosen field, and (3) his legal status was altered, so depriving him of a previously held right. *Doe v. Trustees of Indiana Univ.*, 496 F. Supp. 3d 1210, 1216 (S.D. Ind. 2020).

John Doe fails on the first prong because the University has not disclosed information about John Doe's suspension to any third party. In fact, John Doe never even claims that the University disclosed information about his suspension or that it has an obligation to do so. See *Id. at* 1217 (holding that the plaintiff failed to adequately plead under the stigma plus theory because he never claimed that the University disseminated his disciplinary record.) This failure of pleading alone renders the stigma plus doctrine unavailable to Plaintiff. *Abcarian*, 617 F.3d at 941; cf. *Purdue Univ.*, 928 F.3d at 662-63 (doctrine available where Purdue mandated disclosure of its adjudication to plaintiff's chosen career employer, the Navy). Further, the University will only release information about a student's suspension if that student grants the University authority to do so. [Ex. C, Spotts Dep. Pg. 57:5-58:11.] There is no evidence that the University deviated from this practice. Unlike in *Purdue Univ.* where the plaintiff alleged that the university effectively mandated disclosure to a specific future employer, here the University has not disclosed the suspension, and John Doe does not allege otherwise. 496 F. Supp. 3d 1210.

John Doe also fails the second prong because there is no evidence that it has been impossible for him to find employment in his chosen field. John Doe does not anticipate graduating from the University until next year. [Ex J, John Doe Dep. pg. 9:22-10:4.] Further, he has not applied to, nor decided which graduate institutions he will apply to. [*Id.* at 87:4-17.] Thus, he cannot satisfy the stigma plus test because there is no evidence

that his suspension hindered his career prospects. *Doe v. Bd. of Trustees of Univ. of Illinois*, No. 17-CV-2180, 2018 WL 11269804, at 9 (C.D. Ill. July 24, 2018) (Holding that plaintiff did not satisfy the stigma-plus test where he presented no evidence he was denied an educational opportunity because of disclosure of his disciplinary record.)

### D. John Doe's Fourteenth Amendment claims also fail because the University provided him a meaningful opportunity to be heard.

Even if John Doe can show that the University's actions implicated a property or liberty interest, his due process claims fail because the University provided him with notice and sufficient opportunity to be heard. Assuming that a viable interest is at stake, the Court would still need to examine what process was due under the given circumstances. *Charleston*, 741 F.3d at 772. The due process rights for students undergoing disciplinary action within an educational environment are different from those provided to defendants in criminal or quasi-criminal settings – the University need not follow criminal procedures to meet due process requirements. *Linwood v. Bd. of Educ. of the City of Peoria*, 463 F.2d 763, 770 (7th Cir. 1972). Due process requires notice and the opportunity to be heard in a meaningful manner. *Hess v. Bd. of Trs. of S. Illinois Univ.*, 839 F.3d 668, 677 (7th Cir. 2016). The exact process may vary but where universities discipline students for conduct violations, they require notice of the charges, an explanation of the evidence, and an opportunity to present their side of the story. *Doe v. Purdue Univ.*, 928 F.3d at 663. The University

met and exceeded these requirements by giving Plaintiff many opportunities to be heard during the proceedings. He was informed of the allegations and charges against him. [Ex. J. John Doe Dep, pg. 24:15-24:23; Ex B., Struble Dep. pg. 68:1-6; Ex. I. John Doe Notice Letter.] He was able to meet with University officials, give his side of the story, present evidence, and identify witnesses. [See Supra Pg. 7-8: § IV.] He was able to review the evidence relating to his case [Ex. J, John Doe Dep. Pg. 67:1-68:15; Ex B, Struble Dep. Pg. 37:24 – 38:2.] He received a full, fair hearing before a hearing panel and was able to appeal the panel's decision. [Ex. M, John Doe Outcome Letter; Ex. N John Doe Appeal; Ex. O, Appeal Outcome Letter]

III. **The remedies John Doe seeks are unavailable to him.**

John Doe seeks compensation for emotional distress. [Dkt. 1, pg. 16, ¶ 4.] However, this category of damages is unavailable under Title IX. The Supreme Court recently held that emotional distress damages are not available under antidiscrimination statutes enacted under the Spending Clause of the Constitution - like Title IX. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1572 (April 28, 2022). The Court held that "[W]e … cannot treat federal funding recipients as having consented to be subject to damages for emotional distress. It follows that such damages are not recoverable under the Spending Clause statutes we consider here." *Id*. Thus, the University is entitled to summary judgment John Doe cannot seek emotional distress damages under Title IX.

25

**CONCLUSION**

The University has sex-neutral policies and procedures for handling sexual misconduct allegations. The Office followed those procedures here. Both parties had an opportunity to be heard, and the panel analyzed the evidence before making its decision. There is simply no evidence that John Doe was treated unfairly or in a discriminatory manner. John Doe's disagreement with the outcome does not create a material issue of fact. At the summary judgment stage, John Doe can no longer rely on unsupported factual allegations made in the complaint. Instead he must provide evidence supporting his claims to survive summary judgment. Because John Doe cannot do this, the Court should grant the University's Motion for Summary Judgment and dismiss John Doe's claims.

Respectfully submitted,

TAFT STETTINIUS & HOLLISTER LLP

*/s/ Reid Dickerson*
Janica Pierce Tucker
(Ohio Attorney No. 0075074)
65 East State Street, Suite 1000
Columbus, OH  43215
Telephone:  614-221-2838
Facsimile:  614-221-2007
Email:  jpierce@taftlaw.com

Reid Dickerson (#36134-49)
One Indiana Square, Suite 3500
Indianapolis, IN  46204-2023
Telephone:  317-713-3500

26

Facsimile:  317-713-3699
Email:  rdickerson@taftlaw.com


Counsel for Defendant
The Trustees of Indiana University

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2023 this document was filed using the court's CM/ECF system, which will send electronic notification of the filing to all counsel of record.


*/s/ Reid Dickerson*