**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-00524-RLY-MG |
| | ) | |
| THE TRUSTEES OF | ) | |
| INDIANA UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

---

PLAINTIFF'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff, John Doe, for his response to the Trustees of Indiana University's Motion for

Summary Judgment (herein referred to as "the University" or "IU"), states the following:

## I.   COUNTERSTATEMENT OF FACTS and STATEMENT OF MATERIAL FACTS IN DISPUTE

Defendant's "Statement of Material Facts Not in Dispute" is not wholly inaccurate, but it

is incomplete, and lacks context necessary for the Court to render a decision on summary

judgment. Plaintiff therefore provides the following additional facts for the Court's review.

### A.  John and Jane's Encounter

In June of 2020, John Doe was a college sophomore who had never been on a date

before. (DN 76-14 at 18.) He met Jane Doe on a dating app, and they began texting. They never

had a full conversation before June 16, but she would occasionally message him in the middle of

the night. (*Id.*) On June 16, she texted him around 6:00 p.m. (DN 76-15 at 2.) At first he did not

recognize her, but when he remembered who she was, he asked her if she wanted to "get some

food" or "go for a drive/walk." (*Id.*) Jane expressed some discomfort because of COVID 19, to

which John responded "if you don't want to risk it, I completely understand." (*Id.*) Eventually

1

the two decided Jane would come to John's house. Jane asked "would there be a bottle of wine involved?" and told John "let's just see what happens naturally." (DN 76-15 at 3-4.)

John and Jane drank wine together in John's living room until roughly 2:15 a.m. Throughout this time, it is undisputed that John offered Jane a ride home numerous times, but she refused. (DN 76-14 at 38.) Jane also texted her roommate's boyfriend around 12:30 that she did not need a ride. (Sealed Ex. A, hrg tr., DN 82-1 at 107) Also around 12:30, Jane had a video call with her roommate, during which she did not appear intoxicated, she "just seemed like she was having a good time." (DN 76-14 at 21.) At 12:54 a.m., Jane texted her roommate's boyfriend "it looks like I'll be here for a hot minute," and "I'm very drunk." (DN 76-15 at 10.)

At some point thereafter, John and Jane went upstairs to John's bedroom, where Jane demonstrated a calculus problem on John's dry erase board. (DN 76-14 at 25.) They then engaged in some light intimate contact. (*Id.* at 16.) Jane claims not to remember the event, but according to John, Jane initiated kissing and took her clothes off. (*Id.* at 51.) John got up and went to the bathroom. When he came back, he observed that Jane was tired, and so he suggested that they just go to bed. (*Id.* at 17.) It was approximately 2:35 a.m. (*Id.*) At around 2:00 a.m., unbeknownst to John, Jane had texted her roommate that she felt "uncomfortable" and asked for a ride home. (*Id.* at 22.) At no point did she indicate that she had been assaulted, drugged, or made to do anything against her will. Her roommate responded with "DO NOT KEEP DOING THIS [JANE]" and then "Literally nothing has changed since that night at DU. I feel like a scared mother." (DN 76-15 at 9.)

At around 3:00 a.m., Jane's roommate came to John's house, woke Jane up, and drove her home. In all, it took them about 10 minutes to retrieve Jane from the house once they got there. (DN 76-14 at 57.) She was disoriented but was otherwise able to walk and communicate normally. (*Id.* at 22.)

Jane and John texted the next day. The following texts were sent by Jane:
- "oh my god I don't remember any of that/my roommate is definitely super pissed at me/damn I should not have gotten that drunk."
- "idek how I got that drunk/I'm really sorry"

2

- "How pissed was she when she showed up/I need to do some damage control"
- "I've been drinking a lot recently ... "

(*Id.* at 11.) Shortly after these conversations, Jane made up her mind she had been drugged by John. This idea appears to have been first introduced by her roommate. (*Id.* at 22) ("Witness 1 stated that after Complainant explained what had happened, she told Complainant that she thought she was probably drugged so they went to the hospital.")\

### B.  Jane's Capacity and Evidence of Drugging

The problem with Jane's accusations is that there was no evidence to support them – not when she made the accusations, not after the University's investigation, and not at any time during the hearing process. According to the investigator, her initial story was that "she saw [John] pour her first glass of wine and she poured herself another glass and a half." (*Id.* at 3.) Then she went to the bathroom, and when she returned, John "had opened a second bottle of wine and had poured her a glass." She "took a sip of the wine that he had poured her, and that was the last thing she remembered." (*Id.*) Maybe so, and Jane's memory loss no doubt warranted an inquiry of some kind. But Jane was not drugged – not by John, nor anyone else. This should have been quite apparent to the investigators before this matter ever came to a hearing, for several reasons. First, because of the evidence, or lack thereof, submitted over the six months between the incident and the hearing. At her roommate's urging, Jane went for a SANE evaluation and drug testing immediately. The SANE exam, completed on June 17, 2020 – the same day as her alleged assault – shows nothing extraordinary: no bruising, no semen, no bite marks, nothing. (DN 76-19 at 2-11.) The only findings from the exam were petechiae on her breast, which the SANE nurse notes as "susp. sucking wound,"[1] and two 4mm abrasions on her labia, detected by a toluidine blue-tissue stain test.  And if there are results from the drug tests that Jane took – again, on the same day that she was allegedly drugged – no one knows what

---

[1] Petechiae can be caused by a lot of things, including prolonged straining, medicines, and common fungal, viral, or bacterial infection. See https://www.mayoclinic.org/symptoms/petechiae/basics/causes/sym-20050724. Although John Doe admitted to making contact with Jane's breasts, is unclear from the existing record how the nurse arrived at a "sucking wound" in this case.

those results are; Jane steadfastly refused to provide them to the University. None of this mattered, because the University's sexual misconduct complaint system is designed to produce a certain result; i.e., a finding of responsibility, especially where there is a male respondent.

Second, there was an alternative explanation for Jane's memory loss. During this period of time, according to both Jane and her roommate, Jane was averaging an entire bottle of wine every single night. (Sealed Ex. A, DN 82-1 at 211) Jane reported memory loss from drinking in the past. (DN 76-14 at 5.) Jane could not remember whether she had consumed marijuana that day, but told investigators that she might have. (*Id.*) But the long and short of it is: the University became laser-focused on drugging as the only plausible explanation for her lapse of memory. When no evidence of drugging surfaced, they sought to make an example of John anyway.

### C.  The University's Prehearing Process

In 2020, the University had two separate types of complaints that could be brought by aggrieved students: Title IX complaints, which covered on-campus conduct, and "sexual misconduct" complaints, which apparently covered (and still cover) everything else that might happen between students, regardless of where it happened. (DN 76-2 at 10-12 (Struble Dep. at 21-23).) As discussed below, a Title IX complaint offers additional layers of protection to those accused of sexual assault. But since the encounter between John and Jane occurred off campus, Jane's allegation was treated as a "sexual misconduct" complaint by the University.

Jane initially left a voicemail for the Office of Student Conduct on June 20, and had a meeting with investigator Taylor Struble two days later. (DN 76-14 at 2.) Also in attendance at that meeting were Christine Basile, an IU employee and Confidential Victim Advisor (CVA) that had automatically been assigned to Jane, and investigator Simone Cardosa. (*Id.*) On June 24, Jane, Struble, Cardosa, and Basile met with the Bloomington Police Department, and made the decision not to let John Doe know there were any allegations against him. According to Struble, this was because Jane Doe asked the IU not to notify him). (DN 76-2 at 54 (Struble Dep. at 69).) Finally, on July 6, Struble sent John a letter notifying him of the allegations and "instruct[ing]

him to attend an investigation meeting" two days later. (DN 76-14 at 2; 45-46.) Struble's letter did not inform John as to any rights he had other than to "share information related to the incident and any possible witnesses related to the incident for future contact," and provided hyperlinks to the University's policies and procedures and "offices that can assist you as you prepare for the hearing process."[2]  The letter also told John that if he did not attend the meeting, "a University's service indicator hold will be placed on your account, which will restrict you from receiving many services from course registration to transcript requests." (*Id.* at 46.) John scrambled to hire his own lawyer and attended the meeting.

At the July 8 meeting, Struble gave John a "Respondent Information Form," which he was obligated to sign. (*Id.* at 47.) This form corresponds to a form called "Complainant Information Form," which was given to Jane, but with some key differences. Jane's letter provided "a list of resources that can assist you (emphasis added)," which included ten separate agencies. John's letter says "a list of resources have been provided," and included contacts for only five agencies. Jane's form notes that "Complainants are provided the opportunity to participate in this process at whatever level they are comfortable"; no such provision appears in John's form.

 As discussed above, IU investigators requested that Jane provide the results of the drug test she took just after the alleged "drugging," but she never produced those results. Both Bloomington Police and Indiana University Police declined to pursue the matter any further. But the University's investigation continued, because investigators had already made up their minds.

At some point during the process, John requested that the case be considered for alternative resolution options, as set forth in the University's Code of Student rights, Responsibilities, and Conduct. (DN 76-20 at 9.) In August, 2020, although the investigators did not yet have any medical results from Jane – not even the SANE examination – they wrote to each other the following about John's case:

---

[2] Although IU contends that not every allegation makes it as far as a hearing, Struble's letter treats a hearing as a foregone conclusion even at this early stage.

**Mals, Laura 9:34 AM:**
that's great

i do think we need to consider whether this case is eligible for alt. res. due to the drugging allegation

**Struble, Taylor 9:56 AM:**
well he's not believable at all

**Mals, Laura 10:02 AM:**
there isn't a NCO?

**Struble, Taylor 10:03 AM:**
no, she had said she didn't want one

**Mals, Laura 10:03 AM:**
ah

okay

(Sealed Ex B, Excerpts from IU Production, DN 82-2 at 14.) In another conversation, the investigators made it clear that they couldn't tell one case from another. Referring specifically to John Doe's case, they laughed about it:

**Mals, Laura 11:19 AM:**
Yes

ha ha

she asked for this year, and that wasn't this year

**Struble, Taylor 11:19 AM:**
haha they all blend together now

i was trying to remember if ▬▬▬▬▬ was biolgy, but he was biochemistry

**Mals, Laura 11:20 AM:**
me too!!

the math problem

**Struble, Taylor 11:20 AM:**
(rofl)(rofl)

(DN 82-2 at 18.) On August 21, Investigator Struble wrote to Jane, saying "We understand that participating in the University's investigation process can be stressful, and try to limit the amount of information gathering meetings that are required during the process." In that email, Struble requested that Jane provide the SANE results and told Jane that "the other party to this case has

made an alternative resolution proposal." (DN 82-2 at 5.) Jane responded "If he presents a new one with harsher punishments I would hear it but the one he presented I am not interested in." (DN 82-2 at 1.) Struble responded, "Thank you for providing this additional information. I will let-know that you have indicated that you are not interested in pursuing an alternative resolution at this time." Thereafter, despite the fact that Jane explicitly said she would consider an alternative resolution proposal, Struble told John that that option was no longer available to him.

Not only had investigators made up their mind that John's case would go to a hearing from the beginning, but they also introduced allegations that Jane did not independently make. The most salient example of this is the allegation that John "orally penetrated" Jane. Jane never said that this happened, nor that she even suspected anything of the sort, until Struble asked her about it. Even then, Struble's Final Investigation Report states: "Complainant stated that she is not sure if oral penetration occurred, but she would not be surprised if it did." (DN 76-14 at 4.) At the hearing, Jane was asked about this allegation:

> STELMASCZYZK: Can you talk to me about why you stated that you would not be surprised?
>
> COMPLAINANT: Just because I think the morning after, like I felt that there was some pressure on my vagina, like something had happened. And I honestly -- I didn't know what happened that night. We tried to get as much from the SANE report as we could to be able to give with the -- we couldn't get all the results that we wanted from the file. But, yeah, I -- I don't remember anything.

(DN 82-1 at 47) Despite not getting "all the results that they wanted," investigators included oral penetration without consent as one of the main charges of misconduct against John. The charges were explained in a letter dated November 24, 2020, two days before Thanksgiving. (DN 76-20 at 13.) The hearing on sexual misconduct was to take place less than two weeks later, on December 2, 2020.

### D.  The Sexual Misconduct Hearing

Despite the lack of competent evidence against John Doe, and the fact that both John and Jane were amenable to alternative dispute resolution, The hearing went forward as scheduled. The hearing was not live and in person, but held via Zoom. It is worth noting that everyone associated with the University who any meaningful involvement in the investigation and hearing, with the exception of one hearing panel member, identified as female. And the one man who had any role in John Doe's hearing displayed bias toward the complainant at the hearing; during his questioning of Jane, he apologized to her for "having to relive" an incident that Jane claimed not to remember at all. (DN 82-1 at 39.)

Jackie Stelmasczyzk, who was selected by IU to chair the hearing, has no formal legal training. John did not know this at the time of the hearing, but Stelmasczyzk had previously made social media posts demonstrating a bias against men. On August 20, 2020, she tweeted "men who ghost . . . ain't shit[.]" On April 27, 2019, she retweeted a comic that read, "What's the difference between being assertive and aggressive? Your gender." (Ex. D, DN 81-4 at 3.)

Per University policies, since this was a "sexual misconduct" hearing and not a Title IX hearing, John Doe could only pre-submit written questions for the complainant. Neither John nor his advisor were allowed to question Jane directly. (DN 76-20 at 11.) John's advisor was not permitted to speak during the hearing at all, in fact.

John and Jane testified that they each consumed approximately the same amount of alcohol. Even without cross-examination, Jane testified that she had, in her opinion, not had enough alcohol to become incapacitated. (DN 82-1 at 18) ("I'm absolutely positive that there's no way that I would have been in that state of mind with the amount of alcohol that I had consumed.") Witnesses confirmed that Jane was lucid during a 12:30 a.m. video call, (DN 82-1 at 101) and texts entered into the hearing record confirmed that she was still communicating coherently as late as 2:00 a.m. (DN 82-1 at 60.) Although her original story was that she could not remember performing a calculus problem on John's dry erase board after her final sip of wine, Jane appeared to confirm during the hearing that she had done so. (DN 82-1 at 70.)

8

(STELMASCZYZK: "Can you explain how you were able to perform a calculus[*sic*] equation while allegedly incapacitated? COMPLAINANT: Yeah, so I did like two years of calculus in high school -- I -- of AP calculous[*sic*], and of like AB and BC, and then I tutored a lot of people in calc freshman year and sophomore year, so doing math and calculus, while sober or intoxicated, is not uncommon for me.").

Nonetheless, Jane's story remained that she had been drugged, a story for which there was no evidence. John Doe was the only one who saw any value in asking about Jane's failure to produce the drug tests she took on the day of the alleged assault. Reading a pre-submitted question from John, the Hearing Chair asked:

> CHAIR JACKIE STELMASCZYZK: Why did you not submit the results from your drug tests?
>
> COMPLAINANT: They did not come back with the same result. They wouldn't like offer all of them or all of like the results, the police, something with that, otherwise I would have.

(DN 82-1 at 70-71.) The Chair did not delve any further into this confusing answer, and per IU policy John was not able to cross-examine Jane, so that was the last word on the matter. Jane also testified that she deleted text messages from her phone during the course of the investigation, but no one thought that was worth following up on, either. (DN 82-1 at 72-73.)

John introduced the testimony of Michael Turk, a certified forensic polygraph examiner who regularly works with the Indiana Department of Corrections. Turk administered two polygraphs to John Doe, both of which indicated exactly what John maintained throughout: he did not drug Jane, nor did he sexually assault her. (DN 82-1 at 166-170.)

Questioning by the hearing panel was mostly disorganized, irrelevant chaos, but demonstrated bias against John. This bias was on display during the closing questions by panel members, who were preternaturally concerned not about Jane's capacity, but with the lascivious details of the intimate contact between John and Jane. Questions by the panel included the

following: "[John], can you recall if your penis was erect during that interaction?" "Were you cuddling? I would like to know a little bit more about that." "Do you normally sleep in the nude?"  (DN 82-1 at 238-262.) In contrast, Jane was asked a single question by the hearing chair, which was "do you recall any conversation about the drunk test?" Jane said she did not, and that was the end of the panel's questioning.

### E.  The University's Decision and John's Appeal

On December 11, 2020, John Doe received a final decision from the Office of Student Conduct, finding him to be in violation of IU's sexual misconduct policy. (DN 76-25.) The hearing panel determined by a preponderance of the evidence that John had "engag[ed] in non-consensual sexual activity, including kissing her, touching and kissing her breasts, digitally penetrating her vagina, and making contact with her vagina with your penis while she was incapacitated." Based on a careful parsing of John's own statements – which the panel also somehow found to be "not credible" – the panel determined that John had made contact with Jane's breasts and vagina. However, the panel recognized that there was no evidence of drugging and no evidence of oral contact with Jane's vagina, so those charges were unsubstantiated. However, the panel decided:

> Based on Respondent's statements in the hearing that he was able to <u>observe his own intoxication</u> from alcohol, Respondent's statements in the file and hearing that he <u>observed Complainant consume approximately the same amount of alcohol as he did</u>, Respondent's statements in the file and hearing that Complainant and Respondent consumed two bottles of wine together, and Respondent's statements in the hearing that there was approximately 5 minutes between sexual activity and being unable to wake Complainant to consciousness, the panel determined that, based on the preponderance of the evidence, Complainant was incapacitated, and Respondent knew or should have known that she was unable to provide consent.

(DN 76-25 at 5-6, emphasis added.) In other words, Jane, not John, was found to be incapacitated not because she was drugged, but because she consumed the same amount of alcohol as John. And because John "observed his own intoxication," he was credited with more capacity – never mind the fact that Jane had also "observed her own intoxication" in text messages with friends.

Here it is important to note that the University's policies do not equate intoxication with incapacitation. See https://education.indiana.edu/faculty/_docs/instructor-resources/Title-9-Presentation.pdf (Ex. E, IU Title IX Presentation, DN 81-5 at 5) ("With respect to alcohol and drugs, intoxication and/or impairment is not presumptively equivalent to incapacitation.") This did not matter to the hearing panel, nor did it matter that by Jane's own testimony, she had *not* consumed enough alcohol to be incapacitated. The allegation that she had been drugged, though debunked, evidently still convinced the hearing panel.

The panel further found "aggravating factors," which included "Respondent purchasing the alcohol Complainant consumed and observing her consume each drink, the level of incapacitation of Complainant," and Respondent's inability to articulate in the hearing how he knew Complainant to be "okay" or "fine" to consent to sexual activity[.]" It is unclear why *who* purchased alcohol can be an aggravating factor, but it is quite clear from the record that Jane prompted John to buy alcohol in the first place. As for the level of incapacitation of the Complainant, it is unclear how John was to know how "incapacitated" she was, when Jane herself testified that she did not think she had had enough alcohol to be incapacitated. And John did in fact testify that Jane first initiated sexual contact. None of this mattered. The University suspended John from December 23, 2020, through August 15, 2022.

John appealed. On January 15, 2021, the Associate Vice Provost for Student Affairs upheld the hearing panel's decision in its entirety. (DN 76-27.)

### F.  Pressure on Institutions of Higher Education Nationwide

In 2011, the United States Department of Education's ("DOE") Office of Civil Rights ("OCR") issued a document known as the "Dear Colleague" letter (available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html). The letter began by noting that "[s]exual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX" and explaining that the purpose of the letter was "to assist recipients, which include school districts, colleges, and universities . . . in meeting [their

Title IX] obligations" by "lay[ing] out the specific Title IX requirements applicable to sexual violence." (*Id.* at p.2.) As for those requirements, the letter stated that "in order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard . . . . The 'clear and convincing' standard . . . is a higher standard of proof [that is] not equitable under Title IX." (*Id.* at p.12.) The letter also stated that "OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other . . . . Allowing an alleged perpetrator to question an alleged victim directly may . . . perpetuat[e] a hostile environment." (*Id.* at p.13.) The letter emphasized that due process concerns should take a backseat to expediency, stating: "schools should ensure that steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant." (*Id.*) Finally, the letter stated that "[w]hen conducting Title IX enforcement activities, OCR seeks to obtain voluntary compliance from recipients. When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department [of Education] or refer the case to the U.S. Department of Justice for litigation." (*Id.* at p.17.) See discussion in *Unknown Party v. Ariz. Bd. of Regents*, 624 F. Supp. 3d 1079, 1084 (D. Ariz. 2022).

The resulting pressure on institutions of higher education to adequately punish real or imagined "sexual misconduct" has been well-documented. In September of 2022, KC Johnson, a professor of history at Brooklyn College and the City University of New York's graduate center, together with high-profile lawyers who represent students in disciplinary proceedings, produced a report entitled "Comments of Concerned Lawyers and Due Process Advocates in Support of Fundamental Fairness for All Parties in Title IX Grievance Proceedings." The Court is encouraged to review this report, which is attached as Exhibit C (DN 81-3), in its entirety. The report outlines comments made by federal officials including Catherine Lhamon, former Assistant Secretary for Civil Rights at the DOE, who in 2014 expressed impatience with college campuses for not finding enough students responsible for sexual misconduct, and not doing it quickly enough. *Id.* at 21, citing *Doe v. Univ. of the Scis.*, 961 F.3d 203, 213 (3d Cir. 2020) ("An

official from DoEd's Office of Civil Rights ('OCR') warned that '[s]ome schools still are failing their students by responding inadequately to sexual assaults on campus. For those schools, my office [in DoEd] and [the] Administration have made it clear that the time for delay is over.' (statement of Catherine Lhamon, Assistant Secretary for Civil Rights, U.S. Dep't of Educ.). That official cautioned that OCR was 'committed to using all its tools to ensure that all schools comply with [T]itle IX so campuses will be safer for students across the country.' To ensure compliance, OCR put all of 'a school's federal funding . . . at risk if [the school] could not show that it was vigorously investigating and punishing sexual misconduct.'") (internal citations omitted); *Doe v. Purdue Univ.*, 928 F.3d 652, 668 (7th Cir. 2019) (citing the same statement by Lhamon).

Around the same time as the statements by Lhamon, OCR was conducting heavy-handed "audits" of universities around the country, including Indiana University, in order to ensure the expediency promised by the Dear Colleague letter. Johnson's report discusses the results of those audits, according to those who were on the frontlines:

> In 2014, University of Maine Dean Robert Dana recognized that federal pressure made inevitable a rush to judgment on individual allegations: "I expect that that can't help but be true. Colleges and universities are getting very jittery about it." In late 2020, former OCR lawyer Jackie Gharapour Wernz admitted, "We did see some bad cases in the Obama era, cases where it basically didn't matter what evidence there was. The college was going to find against the defendant, the male defendant, no matter what. I think the schools felt pressure under the Obama guidance." In July 2022, ATIXA[3] president Brett Sokolow recalled "that the problem of biased outcomes was real. Educational institutions railroaded those accused of sexual violence and harassment (mostly cisgender men) in numbers that should terrify any reasonable person.

(Ex. C, DN 81-3 at 18, internal citations omitted.) Similarly, the Foundation for Individual Rights and Expression (FIRE) conducted research into policies at 53 top U.S. universities, and discovered that as of 2017, there was a "nationwide campus environment so hostile to basic procedural protections that nearly three-quarters did not guarantee students a presumption of innocence in all campus proceedings, and fewer than half even required impartial factfinders."

---

[3] This refers to the Association of Title IX Administrators. See https://www.atixa.org/

FIRE, Spotlight on Due Process 2017, available at https://www.thefire.org/research-learn/spotlight-due-process-2017).

The pressure to produce "results" by OCR has resulted in real consequences not just for students who find themselves caught up in quick-and-dirty misconduct adjudications, but for the higher educational institutions themselves. Professor Johnson's report notes that since the Dear Colleague letter, "courts have issued a resounding 75 decisions against colleges on gender discrimination under Title IX." (Ex. C, DN 81-3 at 3.) The holdings in these cases are discussed further in the Argument section below, but for nearly all of them, the consequences of the Dear Colleague letter have provided an important "backdrop" to understanding what happened to the plaintiffs.

Recognizing the rather obvious issues in the fair and nondiscriminatory application of campus discipline created by the Dear Colleague letter, the Trump administration rescinded the letter in 2020 and made sweeping changes to Title IX. 34 C.F.R. § 106.1-106.82 (2023). Under the new regulations, universities were required to: impose a presumption of non-responsibility onto the accused; provide the accused student with notice of either the violations or any details in the claim; provide an impartial decisionmaker who is free from biases toward any party; impose rules of evidence that are more inclusive; and conduct live hearings during which cross-examination is permitted. 34 C.F.R. § 106.45(b)(6)(i). The Trump-era regulations were meant to respond to the lack of protection for *respondents* in university disciplinary proceedings, a need underscored not only by this case but by the 75 other cases discussed in Johnson's report. In response, universities – including IU – "carved out entirely new procedures to give students as few protections as legally possible, rather than incorporating the mandatory safeguards into their existing sexual misconduct policies."[4] In other words, although there was a prescribed process in place designed to provide adequate due process protections, IU elected not to use that process for alleged sexual misconduct if it occurred off-campus, with the perverse result that students

---

[4] https://www.thefire.org/news/report-campus-due-process-protections-improved-under-2020-title-ix-regulations-new-proposal

accused of *on-campus* sexual misconduct have more rights than those accused of misconduct anywhere other than at IU.

### G. IU's Response to Pressure by OCR

The concerns expressed by scholars, lawyers, deans, and courts regarding disciplinary procedures were manifest at Indiana University in the years following the Dear Colleague letter. IU, like many universities, was subjected to a multi-year OCR audit which ended shortly before the events described in the instant case. The audit, which began in March 2014 and lasted until February of 2018,

> revealed that . . . the University's response to incidents of sexual harassment and sexual violence was lacking. OCR identified concerns with the timeliness of the University's response to some reports of sexual harassment, sexual violence, and retaliatory harassment. OCR further observed a significant number of cases where the University complied with a complainant's request not to proceed with an investigation but did not document any effort to determine whether doing so would pose a risk of creating a hostile environment for the University community or steps the University took to address a possible hostile environment. Finally, in a limited number of hearings, OCR observed conduct by hearing panelists, participants, and/or their attorneys that may have created or contributed to a sexually hostile environment.

(Ex. F, OCR Letter, DN 81-6 at 14.) The message here, as elsewhere, was clear: discipline more students, and do it quickly, or lose funding. In addition to the concerns about "timeliness," and about the University's perceived failure to pursue complaints even when the complainant does not want to (*Id.* at 15), the OCR expressed concern about IU's response to off-campus sexual misconduct. (*Id.* at 4; 16-20.) Notably absent from the OCR letter is any concern about procedural fairness or wrongful accusations; the document is singularly focused on obtaining more findings of responsibility. The OCR investigation garnered national attention.[5]

---

[5] See https://www.nytimes.com/2016/02/18/us/accusation-at-indiana-university-triggers-review-of-sexual-misconduct-cases.html. Just before the events described in the instant case, IU had come under further media scrutiny for sexual misconduct by a professor. https://www.insidehighered.com/news/2019/05/13/professor-accused-misconduct-admits-it-and-resigns.

Like most universities, IU caved to OCR's pressure. On February 22, 2018, Executive

Vice President and Provost Lauren Robel issued a letter to the IU community which explained

the University's response to OCR's audit:

> I also want to review actions the campus has taken in this general area. Last August,
> we launched the Office for Sexual Violence Prevention and Victim Advocacy,
> which oversees and coordinates the campus' sexual violence prevention initiatives
> and provides victim advocacy services through Confidential Victim Advocates.
> This office works in partnership with specially trained counselors and Sexual
> Assault Nurse Examiners at the IU Health Center to provide comprehensive care
> and support for students who have experienced sexual violence.

*https://provost.indiana.edu/statements/archive/robel/title-ix.html* (Ex. G, DN 81-7.) Robel's

letter only mentions measures taken to vindicate complainants; there are no additional

protections for those accused of sexual misconduct or procedural safeguards for respondents.

And the measures discussed in Robel's letter played a role in the instant case: Jane Doe was

automatically assigned a Confidential Victim Advocate, who presumably "worked in

partnership" with the SANE nurse who examined Jane.

Robel's letter goes on to say, "The campus has taken numerous other steps, which can be

found at stopsexualviolence.iu.edu." This website directs to the Code of Student Rights which

was in effect at the time of John and Jane's encounter. (DN 76-20 at 9.) Again, there are virtually

no protections or resources listed for respondents, even those wrongfully accused. Virtually all

the steps listed on that site are aimed at providing resources for alleged victims. This, Robel's

letter claims, created a "fair and unbiased system" at IU.

Upon the implementation of these changes, IU, like many other universities nationwide,

turned into a machine that suffered from severe tunnel vision when it came to male respondents.

Ample and stark evidence of such bias exists. Shortly after the OCR launched its investigation

into IU's Title IX practices, the Division of Student Affairs released a survey report entitled

"Community Attitudes and Experiences with Sexual Assault." The report, attached hereto as

Exhibit H, is still available on the University's website at https://surveys.indiana.edu/acc-

docs/sexual-assault-climate-survey/climate-survey-full-report.pdf. One passage of the executive

summary states:

> One particularly noteworthy finding is that the percentage of <u>undergraduate women</u>
> participants who experienced some form of nonconsensual sexual contact – ranging
> from inappropriate touching to attempted or completed sexual penetration – before
> coming to IU mirrors the percentage who indicated they have experienced similar
> types of misconduct at IU. This suggests that the problem of sexual assault is not
> unique to college life, a fact that is worth broader discussion.
>
> Participants were asked their views on resources available to them related to sexual
> assault, their general opinions on the safety of the Bloomington campus and
> community and the level of confidence they had in the university when it came to
> effectively preventing and dealing with sexual assault. A modest majority of the
> <u>undergraduate women</u> said the university can do more to keep students safe, but a
> larger majority of all <u>women participants</u> reported feeling safe while on campus –
> although the percentage who reported to feeling safe in downtown Bloomington or
> in areas outside the city was smaller.

(Ex. H, DN 81-8 at 3, emphasis added.) Under "Key Findings," the report explains:

- 35 percent of the <u>undergraduate women</u> and 34 percent of the <u>graduate women</u>
  participants reported being sexually harassed while at IU.

- Two-thirds of both the <u>undergraduate and graduate women</u> participants who reported
  experiencing some form of nonconsensual sexual contact, said the assailant was known to
  them.

- 86 percent of both the <u>undergraduate and graduate women</u> participants who reported
  experiencing some form of nonconsensual sexual contact did not report the incident to
  anyone at IU.

- Among the <u>undergraduate women</u> participants who did not report incidents of completed
  or attempted nonconsensual sexual penetration, 45 percent said the incident was not
  "serious enough to disclose to others." 29 percent of the <u>women graduate</u> participants
  reported similarly.

(*Id.*, emphasis added.) Notably absent from the executive summary and the "key findings" is any

indication that a man might ever be a victim of sexual violence.[6] In IU's abridged version,

women are the survivors and men are the perpetrators.

---

[6] The refusal to acknowledge sexual violence against men not only creates bias toward men who are wrongfully accused of such violence, as in this case, but also does a tremendous disservice to male victims. See National Alliance to End Sexual Violence, "Male Victims," https://endsexualviolence.org/where_we_stand/male-victims/

This simplified narrative has parlayed itself into standard practice at IU. In discovery, the University provided data on every investigation into sexual misconduct conducted by IU in 2019-2020. (Exhibit I, DN 81-9, Responses to First Interrogatories.) Of 38 investigations:

- Only 7 out of 46 complainants were male;
- Of the cases involving male complainants, only one resulted in a finding of responsibility against the respondent, resulting only in probation. All the others were resolved via "Compliance with Alternative Resolution Agreement";
- No female respondent was subjected to any discipline harsher than probation;
- Expulsions and suspensions only resulted when there was a female complainant and a male respondent (See Ex. I, DN 81-9, Interrogatory No. 15);
- Every lead investigator assigned by the university was female.

In subsequent discovery responses, the University explained that between 2015 and 2022, a total of 50 Title IX or sexual misconduct investigations in which female complainants made allegations against male respondents went to a hearing. (Ex. J, DN 81-10 Responses to Third Interrogatories). 80% percent of those cases resulted in findings of responsibility against the male student, and nearly all of those resulted in severe discipline (suspension or expulsion).

## II.   ARGUMENT

The argument below is divided into four main sections. First, Plaintiff argues that summary judgment should be denied because genuine issues of material fact remain on his Title IX discrimination claim. Pressure on universities to find male respondents guilty in sexual misconduct proceedings, combined with procedural irregularities in this case, overtly discriminatory statements made by University officials, and the fact that the administrative finding against Doe was obviously wrong, provide more than enough evidence of discrimination

---

(noting that "It may be challenging for some to think of men being the victims of sexual crimes because it is challenging to recognize men as "victims" and still think of them as men. This socialization can make it less likely for men to seek services and can make it less likely that appropriate services are available.").

to reach a finder of fact. Secondly, since Doe requests prospective injunctive relief, the Trustees are not entitled to Eleventh Amendment immunity. Third, genuine issues of material fact remain on Doe's due process claim. Finally, Plaintiff is entitled to seek emotional distress damages, or at least compensatory damages related to his medical bills incurred as a direct result of the University's discrimination and deprivation of his constitutional rights. These arguments are explained further below.

## A. GENUINE ISSUES OF MATERIAL FACT EXISTS ON PLAINTIFF'S TITLE IX CLAIM

Federal courts have fashioned a variety of tests to evaluate disciplinary discrimination under Title IX, and have refined those tests in the wake of the tidal wave of litigation following the Dear Colleague letter. These include the "selective enforcement" standard, in which a plaintiff must demonstrate that "regardless of [his] guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender," *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994), and the "erroneous outcome" standard, in which the plaintiff can prevail by showing that he "was innocent and wrongly found to have committed the offense." *Id. (quoted in Doe v. Purdue Univ.*, 928 F.3d 652, 667-68 (7th Cir. 2019)). These approaches are instructive in that they demonstrate that there are a variety of ways to demonstrate disciplinary discrimination. But the Seventh Circuit, along with several sister circuits, has elected a simpler framework that asks: "do the alleged facts, if true, raise a plausible inference that the university discriminated against [plaintiff] on the basis of sex?" *Id. Accord Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020); *see also Sheppard v. Visitors of Virginia State Univ.*, 993 F. 3d 230, 236 (4th Cir. 2021); *Rossley v. Drake Univ.*, 979 F.3d 1184, 1192 (8th Cir. 2020); *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020). In the recent case of *Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021), the Tenth Circuit adopted the Seventh Circuit framework in *Purdue* and reformulated it for the summary judgment

stage as follows: "Could a reasonable jury—presented with the facts alleged—find that sex was a motivating factor in the University's disciplinary decision?" *Id.*[7]

The answer in this case is "yes." Of the 75-plus decisions rendered against higher education institutions since the Dear Colleague letter in 2011, Professor Johnson and his "concerned lawyer" co-authors note commonalities that were important to the courts' reasoning. (Ex. C, DN 81-C at 4.) These are set forth below, with additional context and application to the instant case.

### 1.   Obviously wrongful discipline of male respondents.

This category refers to factual determinations that are so clearly against the evidence presented throughout the course of a university's investigation and/or hearing that they suggest discriminatory bias. In *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019), the Seventh Circuit reasoned that a "perplexing" basis of decision can support an inference of sex bias. Examples of such "perplexing" decisions abound. In *Doe v. Oberlin Coll.,* 963 F.3d 580, 585 (6th Cir. 2020), a hearing panel found that a male student was responsible for sexual misconduct after he engaged in oral sex with a student who told him she was "not sober." "The panel cited no other behavior supporting a finding either that Roe was incapacitated . . . or that Doe would have had any reason to think she was." *Id.* The female complainant's friends testified that they spoke to her the night of the incident and that she seemed intoxicated, but not incapacitated. *Id.* at 584. Calling the panel's decision "arguably inexplicable," the Sixth Circuit held that there was no evidence that the complainant was "incapacitated" as opposed to just intoxicated, and, critically, that there was no "apparent reason for Doe to perceive that Roe was in such a state. To the contrary, Roe was conscious and aware enough to engage in a coherent exchange of texts, [and] to make small talk[.]" *Id.* at 588. The court ended by noting that this was "nearly a test case regarding the College's willingness ever to acquit a respondent sent to one of its hearing panels[.]" *Id.* In *Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930, 939 n.12 (9th Cir. 2022), the

---

[7] The Tenth Circuit nonetheless noted that "evidence of an erroneous outcome or selective enforcement are means by which a plaintiff might show that sex was a motivating factor in a university's disciplinary decision." *Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021)

Ninth Circuit recounted inconsistencies and outright lies told by the complainant in assessing

UCLA's decision to suspend the respondent, noting that "when confronted by a claim that lacked

merit, the University rushed to judgment in issuing the two-year interim suspension and then

sought out a way to find the accused responsible for something in order to justify its earlier

action." And in *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 211 (D. Mass. 2017), a female

student made allegations against a male student, who everyone agreed was more intoxicated than

she was after she performed oral sex on him. There was evidence that the complainant's

allegations were made to allay the anger of her roommate, who was dating the male student at

the time. The complainant's subsequent text messages suggested that the encounter was

consensual, and proposed lying to others about what had happened. *Id.* at 209. The college's

motion to dismiss was denied in part on the basis that it had ignored relevant, exculpatory

evidence that tended to absolve the plaintiff. *Id.* at 218.

A number of "perplexing" findings by the hearing panel in this case suggest that Doe's

discrimination claims should go to a jury. First, as in *Oberlin*, there was no testimony to suggest

that Jane Doe was incapacitated in this case other than her own claim that she did not remember

the events of the night. And as in *Oberlin*, Jane's roommates testified that she was functioning

well enough and communicating with them throughout the night. Having no memory of an event

is not incapacitation, and even if it is, there is no indication here that John had any reason to

know Jane was incapacitated. By her own testimony, she had not consumed enough alcohol to be

incapacitated, and John had consumed the same amount as she had. This, combined with Jane's

initial treatment of this as a consensual encounter, and Jane's roommate's text reading "DO NOT

KEEP DOING THIS," should have prompted more criticism from IU, to put it mildly. Instead,

they decided John was guilty from the moment Jane incorrectly alleged that she was drugged,

and molded the evidence in the hearing to fit this narrative.[8]

---

[8] Again it bears mention that the University determined Jane was "incapacitated" simply because *she fell asleep* shortly after their encounter. No one ever claimed, and there is no evidence, that John did anything to her whatsoever after she went to sleep.

*Doe v. Univ. of Denver*, the most recent lodestar on summary judgment in discriminatory discipline cases to be issued by a circuit court, is instructive. In that case, the complainant treated the encounter as consensual, but reported after "someone else told [her] that it was sexual assault." 1 F.4th 822, 827 (10th Cir. 2021). The complainant submitted SANE records that were inconclusive, and refused to submit the entirety of her medical records upon the investigator's request. The Tenth Circuit concluded that, in a light most favorable to the plaintiff, the University's uncritical acceptance of the complainant's story was enough to create a plausible inference of sex bias. *Id.* at 834. ("The Final Report acknowledges Jane had chosen what pages of the SANE report to provide and had omitted potentially important exculpatory information— yet the report still concludes that "any speculation regarding what might be found in those documents does not outweigh the concrete information in the sections that have been provided to the Investigators.")

Here, although Jane's primary and ongoing allegation was that she had been drugged, an idea that was introduced by her roommate. Jane never claimed that she had consumed so much alcohol that she was incapacitated. Nonetheless, the Final Investigative Report relegates Jane's refusal to submit the results of her drug test to a single footnote. (DN 76-14 at 6.) In *Denver*, the university accepted the assault story, which was false, and obtained a finding of responsibility in defiance of the evidence. Here, IU accepted the "drugging" story, which was false, and contrived "incapacitation" in a consensual encounter for which both parties had consumed roughly the same amount of alcohol. The difference here is that IU's Final Report, unlike Denver's, notes no inconsistencies at all. As then-Judge Barrett wrote for a unanimous panel of the Seventh Circuit, given the panel's decision to favor Jane's account despite the dearth of evidence that John did anything wrong, "[i]t is plausible that [the University] chose to believe Jane because she is a woman and to disbelieve John because he is a man." *Id.*

The University claims that the investigators made "diligent and painstaking efforts to ensure the process was fair." (DN 79 at 24.) Their sole evidence of this is that investigators did not include a prior unrelated allegation from when Doe was in high school in their final report.

Magnanimous, to be sure, but not enough to outweigh the overall unfairness of the proceedings, especially where investigators were texting each other about how "not believable" John was four months before the hearing. If this is considered an "*extra* measure," it underscores the bias inherent in the investigative process. In any event, the prior allegations came up at the hearing anyway. (DN 82-1 at 176.)

> **2.      An accumulation of procedural irregularities suggesting possible gender bias against male respondents.**

Procedural irregularities in a sexual misconduct investigation and hearing can also provide evidence of sex-based discrimination. Again, the circuits broadly agree on this principle. "[A]t some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding despite the [university's] protests otherwise." *Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930, 941 (9th Cir. 2022); see also *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 950 (9th Cir. 2020). In *Doe v. Univ. of Denver*, discussed *supra*, the Tenth Circuit held that "'disturbing procedural irregularities' can certainly lower the threshold for how much additional evidence of sex bias is needed to make a case worthy of a jury's time and consideration." 1 F.4th at 822. The Second Circuit has held that such irregularities "will permit a plausible inference of sex discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019). *Doe v. Oberlin Coll.*, 963 F.3d 580, 586 (6th Cir. 2020).

Here, there are observable procedural irregularities at the microcosmic level (John Doe's individual case) and at the macrocosmic level (IU as a whole). In John Doe's case specifically, the most glaring irregularity is the failure of IU investigators to relay the simple fact that Jane was willing to talk further about terms of an alternative dispute resolution. This is especially important in context, because nearly all the recent sexual misconduct cases against female respondents at IU have resulted in ADR, and none have resulted in harsh disciplinary sanctions. But in this case, since investigators had already made up their minds that John was guilty, they lied to him about Jane's intentions so that the case would go to a hearing, knowing that harsh

punishment was likely. Furthermore, there is a distinct disparity of resources offered to Jane and John in this case from the very beginning, evidenced most saliently by the fact that Jane was automatically assigned a Confidential Victim Advocate, while John was left to spend substantial money on a private attorney.

At the university level, IU's internal pattern of gender-based decisionmaking against male respondents is highly relevant. In *Doe v. Regents of the Univ. of Cal*., 23 F.4th 930, 938 (9th Cir. 2022), the plaintiff alleged that the respondents pursued by the defendant university were "overwhelmingly male" and that the university had "never suspended a female for two years based upon these same circumstances, nor [has it] used the reasoning that two years is a minimum suspension when issuing a suspension to a female ... under these types of facts...." The Ninth Circuit held that "these are precisely the type of non-conclusory, relevant factual allegations that the district court may not freely ignore." *Id.* Competent evidence of this type does not just get a plaintiff beyond the pleading stage, but beyond summary judgment as well, as discussed in *Unknown Party v. Ariz. Bd. of Regents*, 624 F. Supp. 3d 1079, 1119 (D. Ariz. 2022) ("a reasonable juror could conclude from the starkly different outcomes in cases involving proven instances of "sexual misconduct" in violation of section F-23—where 50% of the male respondents receive a severe sanction but 0% of the female respondents receive a severe sanction—that the process is infected by gender bias.")

Here, there is no evidence that IU has ever meaningfully disciplined a female student at all, let alone suspended her for two years. All the expulsions and suspensions uncovered in discovery were issued against men, and all of those cases were investigated by women. In this respect, this case is no different from *Ariz. Bd. Of Regents,* and presents more obvious bias than that discussed in *Regents of the Univ. of Calif.* Counsel is mindful that correlation does not equal causation, and that there could be perfectly good reasons for these disparities aside from discrimination. But caselaw is clear that these statistics cannot be looked at in a vacuum, and where additional evidence of bias is presented, the claim should properly be decided by a jury. See *Doe v. Univ. of Denver,* 1 F.4th 822, 835-36 (10th Cir. 2021) ("Title IX plaintiffs

challenging the outcome of a sexual-misconduct proceeding will rarely have direct evidence or even strong circumstantial evidence sufficient to overcome a school's 'anti-respondent, not anti-male' argument. But here John has marshaled enough evidence to satisfy his burden of showing . . . that the University's explanations of its conduct were pretextual.").

### 3. Clear pressure to crack down on campus sexual assault amounting to colleges feeling pressure to discriminate against male respondents and find them guilty by any means necessary.

Zooming out to the national level, the Seventh Circuit, like every circuit court to decide the issue, has determined that the national pressure on universities as a result of the Dear Colleague letter, OCR's subsequent investigations, the testimony of officials including Assistant Secretary Lhamon, and other factors, "provide[] a backdrop that, when combined with other circumstantial evidence of bias in [a] specific proceeding, give[] rise to a plausible claim" for sex bias. *Purdue Univ.*, 928 F.3d at 669 (quoting *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018)). "For example, it is reasonable to infer that the [Dear Colleague letter], the threat of losing federal funding if sexual misconduct was not vigorously investigated, and the Joint Legislature Audit Committee's audit regarding the University's "lack of response to sexual harassment claims" would place "tangible pressure" on the University." *Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930, 937 (9th Cir. 2022). *Accord Doe v. Columbia Univ.,* 831 F.3d 46, 58 (2d Cir. 2016) ("There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults."); *Doe v. Univ. of Ark. - Fayetteville*, 974 F.3d 858, 865 (8th Cir. 2020). Again, these circumstances, combined with a one-sided investigation and procedural irregularities, are precisely what propelled the plaintiff past the summary judgment stage in *Doe v. Univ. of Denver*. In that case, "the University was the subject of two investigations by the Department of Education's Office of Civil Rights relating to its handling of sexual-assault claims", and its subsequent changes to policy and procedures allowed an inference of sex discrimination when

looked at alongside other factors. See also *Doe v. Oberlin Coll.*, 963 F.3d 580, 586-88 (6th Cir. 2020) ("[Plaintiff had] amply stated a claim for sex discrimination" where there were "clear procedural irregularities," "the Department of Education's Office of Civil Rights was engaged in a systemic investigation of the College's policies," and the "facts of the case cast . . . doubt on the accuracy of the disciplinary proceeding's outcome."); *Doe v. Univ. of Arkansas*, 974 F.3d 858, 865 (8th Cir. 2020) (concluding a "dubious [disciplinary] decision . . . taken against the backdrop of substantial pressure on the University to demonstrate that it was responsive to female complainants" supports "an inference that a university is biased based on sex.").

The similarities here are undeniable. IU was under scrutiny by OCR and in danger of losing federal funding. As a result, it launched programs aimed solely at complainants. The executive summary from its "Community Attitudes and Experiences with Sexual Assault," clearly contemplates that "complainant" equals "female," suggesting a university-wide mission to hold more men responsible – no matter what. As the statistics and the facts of this case indicate, they fulfilled that mission.

### 4.     Overtly discriminatory statements by University officials.

The fourth category of evidence that this Court should consider is not delineated by Professor Johnson (perhaps because it is relatively rare), but it bears mention in this case. It should be beyond cavil that overtly discriminatory statements made or endorsed by University officials responsible for a sexual misconduct investigation can provide competent evidence of sex bias for Title IX purposes. In *Purdue*, the Seventh Circuit noted that in the same month as the hearing, Purdue Title IX administrators shared a Washington Post article titled "Alcohol isn't the cause of campus sexual assault. Men are." *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019). Although *Purdue* was a 12(b)(6) reversal, Justice Barrett implied that the evidence presented in that case would be enough to overcome summary judgment, too. *Id.* at 670.[9]

---

[9] "To be sure, John may face problems of proof, and *the factfinder might not buy the inferences* that he's selling. But his claim should have made it past the pleading stage, so we reverse the magistrate judge's premature dismissal of it." (Emphasis added.)

However, lacking from the Purdue case was any overtly discriminatory language *by the hearing chair assigned to the respondent's case.* That is the evidence presented by John Doe here. The statements made and retweeted by Jackie Stelmasczyzk on Twitter, even if arguably correct, demonstrate a likelihood of sex bias sufficient to submit to a finder of fact.

In sum, the circuit courts' approach to Title IX discrimination claims in the university disciplinary context is holistic, and allows for generous inferences to be made on much lesser proof than plaintiff presents here. Citing an unpublished case, IU claims that "John Doe's Title IX claim depends on general allegations of sex-discrimination and are not enough to create a triable issue." (DN 79 at 23.) But plaintiff has presented competent evidence of discrimination in every category contemplated by courts in recent memory. If the allegations presented by John Doe in this case are "general," then every circuit court in America, including the Seventh Circuit, has it wrong. The case should go to a jury.

## B. THE UNIVERSITY IN NOT IMMUNE FROM 1983 CLAIMS FOR INJUNCTIVE RELIEF

The Trustees argue that since they are not "persons" under 42 U.S.C. 1983, they cannot be sued for due process violations under that statute. (DN 79 at 25.) They further appear to argue that they are wholly immune from suit under the Eleventh Amendment. This of course is untrue, or at least incomplete. While state institutions may not be sued for money damages,[10] universities are susceptible to claims for prospective injunctive relief pursuant to *Ex Parte Young,* 209 U.S. 123 (1908). This is a very old rule, and not remotely controversial in this circuit. *See Kashani v. Purdue Univ.,* 813 F.2d 843, 848 (7th Cir. 1987) ("a suit for prospective injunctive relief is not deemed a suit against the state and thus is not barred by the Eleventh Amendment."). Plaintiff requested prospective injunctive relief in his complaint, and in a form similar to that recognized as a proper request for such relief by the Seventh Circuit in *Doe v. Purdue.* 928 F.3d at 658. In that case, the court held that the official capacity claims against Purdue's Board of Trustees

---

[10] Monetary damages are still available against universities under Title IX. See *Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979).

could go forward (*id.*), but only on the theory that he was "entitled to an injunction ordering university officials to expunge the finding of guilt from his disciplinary record. For this relief, John has standing: John's marred record is a continuing harm for which he can seek redress." *Id*. at 666. See also *Elliott v. Hinds*, 786 F.2d 298, 302 (7th Cir. 1986) ("reinstatement and expungement of personnel records[ ] is clearly prospective in effect and thus falls outside the prohibitions of the Eleventh Amendment.").

Here, Plaintiff has requested prospective injunctive relief in nearly the same terms as those allowed in *Purdue*. His amended complaint asserts that he is "entitled to injunctive relief that requires Defendant to expunge Doe's official Indiana University student file of all information related to his sexual encounter with Jane Doe." (DN 71 at 26.) Defendant has not claimed that they cannot grant the requested relief (see e.g. *Mulligan v. Ind. Univ. Bd. of Trs.,* No. 1:19-cv-01834-TWP-MPB, 2021 U.S. Dist. LEXIS 61449, at \*12 (S.D. Ind. Mar. 31, 2021)), only that Plaintiff cannot ask for it in the first place because of the Trustees' lack of "personhood." Again, if defendant's argument were correct, it would tend to undermine the Seventh Circuit's Section 1983 jurisprudence in hundreds of cases, including *Purdue*, which contemplates prospective injunctive relief as against universities themselves and their trustees.

## C.  GENUINE ISSUES OF MATERIAL FACT REMAIN ON PLAINTIFF'S DUE PROCESS CLAIM

To demonstrate that John Doe has no protected liberty interest in his education, defendant acknowledges the "stigma plus" test enunciated by the Seventh Circuit.[11] However, the

---

[11] Plaintiff notes that this test as articulated by defendant is far too restrictive because it requires a plaintiff who has not yet graduated to prove what will happen in the future. If, as suggested by the dicta cited by defendant, a plaintiff must wait until they know that it is "virtually impossible for ... [them] to find new employment in their chosen field", then they cannot meet the "stigma plus" test for a liberty interest until after graduation and a presumably prolonged search for a job or a graduate program, thus dramatically shortening the limitations period for filing suit. This is especially so here, where the University suspended John Doe for a year and a half, and due process claims under 42 U.S.C. 1983 only have a two-year limitations period in Indiana. *See, e.g., Parks v. Madison Cnty.*, 783 N.E.2d 711, 718 (Ind. Ct. App. 2002). The University, having wrongfully delayed plaintiff's graduation for almost the entire limitations period, cannot then benefit from its own wrongful conduct by saying that a student who has not yet graduated (and therefore not yet applied to graduate school or for gainful employment) cannot "prove" that employment in his chosen field is "virtually impossible." Plaintiff thinks it better to find that the stigma-plus test is satisfied if there is a high degree of likelihood that plaintiff would be forced to divulge information about a wrongful finding of sexual misconduct on a job or graduate school application. At the very least, plaintiffs' limitations periods

University again steadfastly ignores the Seventh Circuit's analogous treatment of this precise

issue in *Doe v. Purdue Univ*. In *Purdue*, the university argued exactly what IU argues, that is,

that they will "only release information about a student's suspension if that student grants

permission," and therefore any harm resulting from such disclosure will be self-inflicted. (DN 79

at 27.) The *Purdue* panel noted that the plaintiff did "not claim simply that he might someday

have to self-publish the guilty finding to future employers. Instead, John says that he had an

*obligation* to authorize Purdue to disclose the proceedings to the Navy." *Purdue* at 662

(emphasis added). This was enough to satisfy the stigma plus analysis

> because it is not a matter of state-spread rumors or an investigation that was
> ultimately dropped. After conducting an adjudicatory proceeding, Purdue formally
> determined that John was guilty of a sexual offense. That determination changed
> John's status: he went from a full-time student in good standing to one suspended
> for an academic year. . . . it was this official determination of guilt, not the
> preceding charges or any accompanying rumors, that allegedly deprived John of
> occupational liberty.

*Purdue* at 662-63.

Here, it is the purest fantasy to pretend that plaintiff will not have an obligation to

authorize IU to disclose a finding of sexual misconduct, and resulting suspension, to any

graduate program in the country. IU's own graduate program requires applicants to answer

"behavioral questions," and specifies: "Indiana University *requires* applicants to disclose if they

have been subject to formal disciplinary action (including for example, but not limited to,

suspension or expulsion) for academic or non-academic reasons at any high school, post-

secondary institution, college or university[.]"

https://graduate.indiana.edu/admissions/behavioral-questions.html (emphasis added). Pluck any

graduate school out of a hat and their requirements for admission will yield similar results.

Some, like the University of Michigan Rackham School, specify that any student answering

---

should be equitably tolled under such circumstances, or institutions of higher education should be equitably
estopped from making this argument when it has wrongfully suspended students for long periods of time. Candidly,
the holding in *Malhotra v. Univ. of Ill. At Urbana-Champaign*, 77 F.4th 532 (7th Cir. 2023) does indeed militate
against plaintiff's stigma-plus argument in this case, but the fundamental fairness of the "holding and hitting"
approach, as urged by the University here, appears not to have been argued or considered on appeal in that case.

"yes" to a misconduct question on an application must then authorize full access to disciplinary records from the applicant's previous institution. At the very least, the question of John's future employment and graduate school prospects should be left to the finder of fact.

As to the merits of the due process claim itself, the University simply claims that it provided notice and opportunity to be heard, so it cannot be liable. (DN 79 at 29.) But "[t]o satisfy the Due Process Clause, 'a hearing must be a real one, not a sham or pretense.'" *Purdue* at 663 (quoting *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 629 (7th Cir. 2016)). Again, *Purdue* is instructive. In that case, the court suggested that cases in which a hearing authority had already predetermined a respondent's guilt would present a "sham" hearing. *Id*. at 663-64. The court declined to hold whether the failure to allow cross examination would constitute a violation of due process in itself, but noted that the Sixth Circuit has so held. *Id.* at 662 n.4, citing *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018) ("if a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process").

Here, as discussed extensively above, the University made up its mind about John Doe's guilt from the moment that Jane alleged that she had been drugged. When no evidence of a drugging was produced, investigators lied to John about the availability of alternative dispute resolution and pressed his case to a hearing anyway. At the hearing, the panel believed Jane's drugging story despite the fact that her roommates testified that she was not incapacitated, she testified that she had not had enough alcohol to be incapacitated, and – again – she refused to provide the results of any drug test. The hearing chair made statements biased against men, the only man involved in the process made a statement assuming the truth of Jane's story, and John was not allowed to cross-examine Jane. The only reasonable label for a hearing like that is: a sham. The due process violations in this case were arguably even more egregious than in *Purdue*; in the instant case, the new Title IX regulations were in effect, giving university administrators a clear roadmap for proper hearings. IU simply chose to ignore that guidance, with the perverse result that those accused of sexual misconduct *off* campus have significantly fewer rights than

those accused of *on*-campus assault. This Court should hold that the failure to provide an opportunity for cross examination alone is a violation of due process, but it is certain that a disciplinary hearing with a predetermined outcome violated John's constitutional rights. The case should be heard by a jury.

### D.  PLAINTIFF MAY SEEK EMOTIONAL DISTRESS AND RELATED COMPENSATORY DAMAGES

As a parting shot, the Trustees argue that emotional distress damages under Title IX are prohibited by *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1572 (April 28, 2022). However, the Northern District of Indiana has recently addressed this argument: "Because *Cummings* was not a Title IX action, it does not make evidence of emotional distress or harm inadmissible in this case. *Id.* Therefore, evidence of such damages will not be precluded." *Doe v. Purdue Univ.*, No. 4-18-CV-89-JEM, 2022 U.S. Dist. LEXIS 128601, at *10-11 (N.D. Ind. July 20, 2022). Furthermore, the issue of whether *Cummings's* prohibition on recovery of emotional distress damages extends to monetary costs associated with emotional distress in any sort of action is as yet unsettled. At least one district court within this circuit has said that it does not. In *Pennington v. Flora Community Unit School District No. 35*, No. 3:20-CV-11-MAB, 2023 U.S. Dist. LEXIS 10565, at *7-8 (S.D. Ill. Jan. 20, 2023), the court distinguished general damages for emotional distress from compensatory damages for medical expenses associated with psychological injuries. The court stated: "Plaintiffs did not only request emotional distress damages" but rather "very clearly requested medical expenses, which the allegations attribute to treatment for physical injuries they suffered as a result of bullying, as well as treatment for the psychological injuries." *Id.* at *8. "As the Court sees it, these are compensatory damages for economic losses, which *Cummings* did not preclude." *Id. But see M.R. v. Burlington Area Sch. Dist.*, No. 21-CV-1284-JPS, 2023 U.S. Dist. LEXIS 129829, at *9 (E.D. Wis. July 27, 2023) (holding that compensatory damages for medical expenses is a proxy for emotional distress damages).

31

### III.        CONCLUSION

In 2020, then-candidate Biden promised to "immediately" overturn the Title IX changes made by the Trump administration and reinstate the "Dear Colleague" era guidance.[12] The Biden administration proposed new Title IX rules in 2022, but as of this writing, they have yet to go into effect. IU has already essentially rejected additional protections for respondents in cases of off-campus sexual misconduct allegations just because they can. It will undoubtedly roll back the protections for respondents for on-campus behavior as well just as soon as the Biden administration gives the green light to do so. That this is a bad idea should be obvious, not just from this case but from numerous other misconduct cases decided between 2011 and 2020. Before the university rolls back its already meager protections, prompting the inevitable next wave of litigation, this Court has the opportunity to say what a majority of other courts have said: more is required. A university may not assume that a male respondent is guilty until proven innocent, the procedural deck may not be stacked against him, and he must have the ability to meaningfully test the evidence against him – assuming any such evidence exists in the first place. What IU has attempted to do here, like so many other institutions since 2011, is regulate any and all off-campus intimate contact between students. If it really must do so, there must be appropriate safeguards to ensure that an accused student is adequately protected.

For the foregoing reasons, the Trustees' Motion for Summary Judgment should be denied, and this case should be set for trial.

---

[12] See https://www.insidehighered.com/news/government/2023/09/12/new-title-ix-rules-likely-delayed-students-push-other-solutions.

Respectfully submitted,


s/ *Jonathan Little*
Jonathan Little, jon@sllawfirm.com
Annemarie Alonso, annie@sllawfirm.com
SAEED & LITTLE, LLP
#189 – 133 West Market Street
Indianapolis, IN 46204
(317) 721-9214


CERTIFICATE OF SERVICE

I certify that the foregoing document was filed using the Court's CM/ECF system on the date electronically stamped in the header. Service on all ECF-registered counsel of record was made contemporaneously by operation of the same.


s/ *Jonathan Little*
Jonathan Little