UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ALEC ERNY,                              )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )        No. 1:22-cv-00524-RLY-MG
                                        )
BOARD OF TRUSTEES OF INDIANA            )
UNIVERSITY,                             )
                                        )
            Defendant.                  )

**ENTRY GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

In December 2020, Indiana University suspended Plaintiff Alec Erny after finding

him responsible for sexual misconduct against another student, Jane Doe.  Asserting that

the disciplinary proceedings that led to his suspension were infected by anti-male bias,

Plaintiff brings suit against the Trustees of Indiana University ("the University") for sex

discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681,

and for violations of the Fourteenth Amendment under 42 U.S.C. § 1983.  The University

moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (Filing

No. 74).  For the reasons set forth below, the court **GRANTS in part** and **DENIES in

part** the University's motion.

I.     **Background**

       A.     **University Policies**

       The University's Office of Student Conduct ("the Office") handles reports of

student sexual misconduct.  (Filing No. 76-1, Struble Aff. ¶ 3).  The University connects

1

students who report sexual misconduct with a Confidential Victim Advocate ("CVA"), who can serve as an advisor for the complainant.  (Filing No. 76-5, Ronald Dep. at 12–13).  If the Office receives a complaint that falls under the University's sexual misconduct policy, the Office initiates an investigation, during which investigators meet with the complainant and respondent, interview witnesses, and review statements and other documents submitted by the parties.  (*See* Filing No. 76-2, Struble Dep. at 12, 19–24).

In most cases, at any point during this process, the parties may resolve the case through "alternative dispute resolution."  (*Id.* at 27–29).  To do so, the complainant, the respondent, and the University all must agree that alternative resolution is "appropriate."  (*Id.* at 27–28).  Cases that implicate campus safety—including some cases involving "allegations of drugging"—may not be eligible for alternative resolution.  (*Id.* at 29).

If a case proceeds to a hearing, a panel of University faculty, staff, and graduate students reviews the investigators' final investigation report and conducts a hearing, during which the panel hears from the parties and their witnesses.  (Filing No. 76-3, Spotts Dep. at 26; Filing No. 76-4, Stelmaszczyk Dep. at 12–13, 25–28; *see also* Filing No. 82-1, Hearing Transcript).  After the hearing, the panelists deliberate privately to determine whether the evidence supports a finding of responsibility.  (Stelmaszczyk Dep. at 17, 30; Spotts Dep. at 7).  The University uses a "preponderance of the evidence" standard for sexual misconduct cases.  (Spotts Dep. at 16).  The panel articulates its decision in an outcome letter shared with the parties.  (*See id.* at 30; Filing No. 76-25, Outcome Letter).  Either party may appeal the panel's decision.  (Spotts Dep. at 33).

In the background of these policies is the 2011 "Dear Colleague Letter" from the Department of Education's Office of Civil Rights ("OCR"), which was later rescinded. (*See* U.S. Dep't of Educ., Off. of Assistant Sec'y for C.R., Dear Colleague Letter (2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf).  The letter provided guidance to universities for addressing allegations of campus sexual misconduct under Title IX.  (*See id.* at 1–2).  Among other things, the letter explained that "acts of sexual violence are forms of sexual harassment covered under Title IX" and mandated that schools use a "preponderance of the evidence" standard for their disciplinary processes.  (*Id.* at 2–3, 11).  The letter also stated that "schools should ensure that steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant."  (*Id.* at 12).  The letter also instructed that schools could lose federal funding if they failed to comply with the letter and promptly address reports of sexual misconduct.  (*Id.* at 16).

Between 2014 and 2018, the OCR conducted an audit of the University's responses to reports of sexual harassment and violence.  (Filing No. 81-6, OCR Letter at 1).  At the conclusion of the audit, the OCR expressed concern that the University's response was sometimes "lacking."  (*Id.* at 14).  It further explained that:

> OCR identified concerns with the timeliness of the University's response to some reports of sexual harassment, sexual violence, and retaliatory harassment.  OCR further observed a significant number of cases where the University complied with a complainant's request not to proceed with an investigation but did not document any effort to determine whether doing so would pose a risk of creating a hostile environment for the University community or steps the University took to address a possible hostile environment.  Finally, in a limited number of hearings, OCR observed

conduct by hearing panelists, participants, and/or their attorneys that may
have created or contributed to a sexually hostile environment.

(*Id.*).  Around this time, sexual misconduct investigations at the University also received

national news attention.  (*See* Karen Workman, *Accusation at Indiana University Triggers*

*Review of Sexual Misconduct*, N.Y. Times (Feb. 17, 2016),

https://www.nytimes.com/2016/02/18/us/accusation-at-indiana-university-triggers-

review-of-sexual-misconduct-cases.html; Colleen Flaherty, *Acknowledging His Own*

*Misconduct*, Inside Higher Ed (May 12, 2019), https://www.insidehighered.com/news/

2019/05/13/professor-accused-misconduct-admits-it-and-resigns).

### B.    Jane Doe's Sexual Misconduct Allegations

Plaintiff and Jane Doe, both University students, met on a dating app and agreed to

hang out at Plaintiff's off-campus apartment on the night of June 16, 2020.  (Filing No.

76-14, Final Investigation Report ("FIR") Part 1 at 3, 10, 64; Filing No. 76-15, FIR Part 2

at 2–3).  At his apartment, Plaintiff and Jane drank wine until the early morning hours of

June 17.  (Outcome Letter at 3; FIR Part 1 at 61–62).  According to Jane, she blacked out

after taking a few sips of her final glass of wine and has no memory of the rest of her

encounter with Plaintiff.  (*E.g.*, FIR Part 1 at 3, 37; Hearing Transcript at 58).  Jane

reported the encounter to the University as sexual misconduct, alleging Plaintiff drugged

her and then sexually assaulted her.  (FIR Part 1 at 2–4).  Throughout the resulting

disciplinary process, Jane insisted she would not have blacked out after drinking the

amount of wine that she drank that night.  (*See, e.g.*, *id.* at 5 ("[T]here is absolutely no

way [I] got that drunk from drinking half a bottle of wine over the course of 2 hours.");

Hearing Transcript at 18 (Jane: "I'm absolutely positive that there's no way that I would have been in that state of mind with the amount of alcohol that I had consumed.")). Plaintiff denied Jane's allegations. (*See* FIR Part 1 at 10–14; Hearing Transcript at 19).

### C.     The Investigation and Hearing

On June 22, 2020, Jane filed a formal sexual misconduct complaint against Plaintiff, alleging that he violated the University's sexual misconduct policies by "inducing [her] incapacitation for the purpose of making her vulnerable to non-consensual sexual activity . . . while she was incapacitated and/or without her consent." (FIR Part 1 at 2).[1]  Between June and November 2020, University investigators—Taylor Struble, Simone Cardosa, and Laura Mals—gathered evidence from Plaintiff, Jane, and six witnesses. (*See id.* at 1, 88).  The University connected Jane with a CVA, who served as her advisor throughout the disciplinary process. (*Id.* at 2).  Plaintiff hired an attorney. (*See* FIR Part 1 at 2; Hearing Transcript at 6).

At some point, Plaintiff made an alternative resolution proposal, which Struble shared with Jane. (*See* Filing No. 82-2, Struble Emails at 5 (informing Jane that "the other party to this case has made an alternative resolution proposal")).  Jane told Struble she did not "want to accept" Plaintiff's proposal but that she would "hear" another proposal if Plaintiff "present[ed] a new one with harsher punishments."  (*Id.* at 1).

---

[1] The Office treated Jane's report as a "sexual misconduct" complaint, as opposed to a Title IX complaint for sexual assault, because the encounter between Plaintiff and Jane occurred off campus. (*See* Ronald Dep. at 16 (stating Plaintiff and Jane's case was classified as a sexual misconduct case because "it occurred off campus"); Struble Dep. at 11–12 (explaining that conduct that "occurred on campus . . . falls under Title IX" and conduct that occurred "off-campus . . . goes through the university complaint procedures")).

Struble responded that she would inform Plaintiff that Jane was "not interested in pursuing an alternative resolution at this time." (*Id.*).

The case proceeded to a hearing. (*See* Filing No. 76-20, FIR Part 7 at 13; Hearing Transcript). The investigators prepared a final investigation report for the hearing panel. (FIR Part 1). On December 2, 2020, a three-person panel conducted a hearing on the charges against Plaintiff via Zoom. (Hearing Transcript at 1–2).

### D.    The Panel's Decision

After the hearing, the panel determined, by the preponderance of the evidence, that Plaintiff was "responsible for engaging in behaviors towards [Jane] that constitute[d] sexual harassment and sexual assault" in violation of the University's code of student conduct. (Outcome Letter at 2). Specifically, it found him responsible for "non-consensual sexual activity, including kissing [Jane], touching and kissing her breasts, digitally penetrating her vagina, and making contact with her vagina with [his] penis while she was incapacitated."[2] (*Id.* at 2–6). But the panel found "the preponderance was not met" that Plaintiff "induced [Jane's] incapacitation by use of drugs or other non-alcoholic substances." (*Id.* at 3).

Plaintiff appealed the panel's decision, which was affirmed. (Filing No. 76-26, Plaintiff Appeal; Filing No. 76-27, Appeal Outcome Letter at 2). As a result of the

---

[2] The University defines incapacitation as the inability "to understand the facts, nature, extent, or implications of the situation due to drugs, alcohol, a mental disability, being asleep or unconscious, or based on their age (pursuant to Indiana law)." (FIR Part 1 at 35). "[I]ntoxication and/or impairment is not presumptively equivalent to incapacitation." (*Id.*). "Consent does not exist when the individual initiating sexual activity knew or should have known of the other person's incapacitation." (*Id.*).

panel's findings, the University suspended Plaintiff from December 23, 2020, to August 15, 2022.  (Appeal Outcome Letter at 3).  After his suspension, he reenrolled at the University.  (*See* Filing No. 76-22, Plaintiff Dep. at 8–9).

## II.    Legal Standard

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court views the facts in the light most favorable to the nonmovant and draws all reasonable inferences in the nonmovant's favor.  *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

## III.   Discussion

Plaintiff brings two claims against the University: (1) a Title IX claim and (2) a § 1983 claim.  The University moves for summary judgment on both claims.

### A.    Title IX Claim

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving [f]ederal financial assistance."  20 U.S.C. § 1681(a).  Title IX is "enforceable through an implied private right of action" to pursue sex discrimination claims.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998); *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019).  Here, Plaintiff brings a Title IX claim against the University, arguing it exhibited

an anti-male bias throughout its investigation and adjudication of Jane's allegations against him and therefore discriminated against him on the basis of his sex.

"A Title IX discrimination claim requires proof that (1) the educational institution received federal funding, (2) the plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against the plaintiff" on the basis of sex. *Johnson v. Marian Univ*., 829 F. App'x 731, 732 (7th Cir. 2020) (citing *Columbia Coll. Chi.*, 933 F.3d at 854). Only the third element is at issue here. Thus, the only question before the court is whether a reasonable jury could find that the University discriminated against Plaintiff on the basis of his sex during any part of his sexual misconduct case. *See id.* at 732; *Doe v. Trs. of Ind. Univ.*, No. 22-1576, 2024 WL 1824967, at *2 (7th Cir. Apr. 26, 2024) ("The core question under Title IX is whether the people who resolved [Jane's] grievances 'acted at least partly on the basis of sex in [Plaintiff's] particular case.'" (quoting *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019))).

Plaintiff presents various categories of evidence that he maintains permit a reasonable inference of sex discrimination in his case, including (1) evidence of external pressure on the University, (2) University data showing an internal pattern of sex-based decision-making, (3) the panel's "perplexing" decision as explained in the Outcome Letter, (4) procedural irregularities in the investigation and hearing, and (5) anti-male statements made by University employees. The court considers Plaintiff's evidence as a whole to determine whether he has presented sufficient evidence to survive summary judgment. *See Johnson*, 829 F. App'x at 732–33; *Doe v. Univ. of Iowa*, 80 F.4th 891,

8

895–98 (8th Cir. 2023); *cf. Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016) (explaining that, in the employment discrimination context, a court considers a plaintiff's evidence of discrimination "as a whole").  For the reasons discussed below, the court concludes Plaintiff has presented sufficient evidence to permit a reasonable jury to conclude the University acted at least in part on the basis of Plaintiff's sex.

### 1.      External pressure on the University

Plaintiff presents several pieces of evidence he contends demonstrate the University felt external pressure, from the federal government and the national media, to find male students responsible for sexual misconduct.  As many Title IX plaintiffs have done in recent years, Plaintiff sets the stage for his sex discrimination claim by pointing to the Dear Colleague Letter, which pressured universities to quickly address student sexual misconduct.  He further highlights that, in the wake of this letter, the OCR investigated the University and determined its handling of certain reports of sexual misconduct was deficient in several ways.  In the years leading up to Plaintiff's sexual misconduct case, the University also received national news attention related to sexual misconduct allegations.

The Seventh Circuit has instructed that such evidence of external pressure is "relevant" in evaluating Title IX sex discrimination claims and can support an inference of sex bias.  *Doe v. Purdue Univ.*, 928 F.3d 652, 668–69 (7th Cir. 2019) (Barrett, J.) (acknowledging the Dear Colleague Letter and recent OCR investigations are "relevant"); *Johnson*, 829 F. App'x at 732 (acknowledging "background" information, such as the Dear Colleague Letter, OCR investigations, and university trainings and events, "can be

relevant"); *see also Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) (explaining evidence of "external pressure," including federal investigations and media attention, "provides a backdrop" for a sex discrimination claim).[3]  Here, it is reasonable to infer that the Dear Colleague Letter, the OCR's investigation of the University, and national news attention "would affect how the University treated respondents in sexual misconduct disciplinary proceedings on the basis of sex."  *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 948 (9th Cir. 2020) (citing *Doe v. Columbia Univ.*, 831 F.3d 46, 57–58 (2d Cir. 2016)).

But importantly, a plaintiff cannot rely on external pressure evidence alone. *Johnson*, 829 F. App'x at 732 (citing *Columbia Coll. Chi.*, 933 F.3d at 855); *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 792 (7th Cir. 2022) ("Public pressure is not enough on its own to support a claim of [sex] discrimination, however.").  To survive summary judgment, a plaintiff must combine external pressure evidence with evidence suggesting sex bias affected the plaintiff's specific case.  *Johnson*, 829 F. App'x at 732; *see also Doe v. Univ. of Denver*, 1 F.4th 822, 831 (10th Cir. 2021) (explaining external pressure evidence, "standing alone, cannot satisfy a Title IX plaintiff's summary judgment burden 'unless combined with a particularized something more'" indicating the university's decision in

---

[3] The Dear Colleague Letter was officially rescinded in 2017.  *Doe v. Samford Univ.*, 29 F.4th 675, 691–92 (11th Cir. 2022).  The Seventh Circuit has continued to reason that the letter (and, more importantly, other evidence of external pressure) is relevant in assessing Title IX claims and can serve as background evidence supporting an inference of sex bias.  *See Johnson*, 829 F. App'x at 732; *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 792 (7th Cir. 2022); *see also Doe v. Regents of Univ. of Cal.*, 23 F.4th 930, 937 (9th Cir. 2022); *Doe v. Univ. of Scis.*, 961 F.3d 203, 210–11 (3d Cir. 2020).

the plaintiff's particular case was based on his sex (quoting *Doe v. Univ. of Denver*, 952

F.3d 1182, 1193 (10th Cir. 2020))).

### 2. University data

To further set the stage for his sex discrimination claim, Plaintiff also spotlights

data that, he maintains, evinces an "internal pattern of gender-based decision[-]making

against male respondents" in the University's adjudication of sexual misconduct cases.

(Filing No. 83, Pl.'s Resp. Br. at 24).

Courts have recognized that data showing a university unequally punishes male

and female respondents can support an inference of sex discrimination.  *See, e.g.*, *Doe v.

Regents of Univ. of Cal.*, 23 F.4th 930, 938–39 (9th Cir. 2022); *Doe v. Oberlin Coll.*, 963

F.3d 580, 587 (6th Cir. 2020); *Unknown Party v. Ariz. Bd. of Regents*, 624 F. Supp. 3d

1079, 1116–19 (D. Ariz. 2022).  But, as with external pressure evidence, a plaintiff

cannot rely on such data alone to survive summary judgment on a Title IX claim.  *See

Univ. of Cal.*, 23 F.4th at 939.

Here, Plaintiff contends the University has never meaningfully punished a female

respondent accused of sexual misconduct, whereas male respondents are routinely

suspended or expelled for sexual misconduct.  He highlights that, between 2015 and

2022, 80% of hearings involving a female complainant and male respondent resulted in a

finding of responsibility for sexual misconduct, and 90% of those cases resulted in

suspension or expulsion for the male respondent.  (Filing No. 81-10, Def.'s Resp. to Third

Interrogs. at 3).  By contrast, only one female respondent (out of five) was found

responsible for sexual misconduct between 2019 and 2021, and she received probation. (Filing No. 81-9, Def.'s Resp. to First Interrogs. at 14).

Viewed in the light most favorable to Plaintiff, this data could, combined with evidence of sex bias in Plaintiff's particular case (which the court discusses below), permit a reasonable jury to conclude Plaintiff's disciplinary process was infected by sex bias. *See Ariz. Bd. of Regents*, 624 F. Supp. 3d at 1118–19 (concluding that "a reasonable juror could conclude . . . the [plaintiff's] process [was] infected by gender bias" where 50% of male respondents but 0% of female respondents found responsible for "sexual misconduct" received a "severe sanction"); *Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019) (suggesting allegations that male students were disciplined differently than female students "accused of sexual misconduct" would support a plausible inference of sex discrimination).

To be sure, the University identifies potential issues with the conclusion Plaintiff draws from this data. First, the University notes Plaintiff compares only two years of data for female respondents to seven years of data for male respondents. Additionally, the University argues Plaintiff failed to demonstrate that the female and male respondents he compares are similarly situated because the data shows only that they were found responsible for "sexual misconduct" and does not explore the factual situations underlying the findings of responsibility. However, the University's arguments go to the weight of the evidence, rather than provide a reason to disregard the data altogether. Neither the evidence nor the University's arguments foreclose a reasonable jury from concluding Plaintiff's data demonstrates female respondents are punished less harshly

than male respondents.  *See Ariz. Bd. of Regents*, 624 F. Supp. 3d at 1117–19 (concluding

a reasonable jury "could conclude from the starkly different outcomes in cases" involving

male and female respondents disciplined under the university's broad definition of

"sexual misconduct" "that the [plaintiff's] process [was] infected by gender bias"); *Austin*,

925 F.3d at 1138 (indicating male and female respondents "accused of sexual

misconduct" are similarly situated); *cf. McDonald v. Village of Winnetka*, 371 F.3d 992,

1002 (7th Cir. 2004) ("As a general rule, whether individuals are similarly situated is a

factual question for the jury."); *Bell v. E.P.A.*, 232 F.3d 546, 554 (7th Cir. 2000)

(explaining that "[e]vidence of intentional discrimination can include 'evidence, *whether*

*or not rigorously statistical*, that'" similarly situated employees were systematically

treated differently on the basis of a protected characteristic (emphasis in original)

(quoting *Troupe v. May Dep't Stores, Inc.*, 20 F.3d 734, 736 (7th Cir. 1994))).  Plaintiff

could not rely on this data alone to support his sex discrimination claim, but the data

nonetheless could provide helpful background that makes an inference of sex bias in

Plaintiff's case more reasonable.  *See Johnson*, 829 F. App'x at 732; *Purdue*, 928 F.3d at

668–69.

        Relatedly, Plaintiff also points to University data on female students' experiences

of sexual misconduct on campus and a letter written by the University's Provost

describing resources the University created for complainants.  (*See* Filing Nos. 81-7 &

81-8).  But this evidence does not help Plaintiff, despite his argument that it shows the

University favors complainants and believes complainants are invariably female.  The

reality is that both women *and men* can be victims of sexual misconduct and

complainants in sexual misconduct cases. *See Johnson*, 829 F. App'x at 733; *Ind. Univ.*, 2024 WL 1824967, at *2. Because of this, evidence of pro-complainant or pro-victim bias does not support an inference of *sex* bias. *See Ind. Univ.*, 2024 WL 1824967, at *2 (explaining that evidence that a university trained its employees to favor complainants did not support an inference of sex bias); *Doe v. Trs. of Ind. Univ.*, No. 1:21-cv-00973-JRS-MPB, 2021 WL 2982186, at *5 (S.D. Ind. July 15, 2021) ("[A] bias in favor of alleged sexual-assault *victims* . . . does not suggest a bias based on *sex*." (emphasis in original)); *Univ. of Denver*, 952 F.3d at 1196 (noting "[m]ost courts to have addressed the issue have concluded that evidence of a school's anti-respondent bias does not create a reasonable inference of anti-male bias").

Having considered Plaintiff's background evidence suggesting external pressure on the University and a pattern of sex-based decision-making in the University's sexual misconduct cases, the court now turns to Plaintiff's evidence of sex bias in his particular case.

### 3.    The panel's "perplexing" decision

To show sex bias in his case, Plaintiff begins by identifying various "'perplexing' findings" the hearing panel made in its decision. (Pl.'s Resp. Br. at 21).

Plaintiff spends significant time retelling his story of his encounter with Jane and explaining why he was, and is, not responsible for sexual misconduct. As an initial matter, the court's role here is *not* to reweigh the evidence presented to the hearing panel in order to determine what exactly happened between Plaintiff and Jane on June 17, 2020. *See Univ. of S. Ind.*, 43 F.4th at 792 ("[F]ederal district and appellate courts do not

provide third and fourth forums—after the university [panel's] hearing and the [university] appeal—to decide what actually happened between Jane and John on th[at] night . . . ."). Whether the hearing panel reached the wrong conclusion in Plaintiff's case is none of the court's concern—unless the University's decision was based on Plaintiff's sex. *See Ind. Univ.*, 2024 WL 1824967, at *1.

That being said, a "perplexing" decision by a hearing panel can support an inference of sex discrimination. *Purdue*, 928 F.3d at 669; *see also Oberlin Coll.*, 963 F.3d at 588 (reasoning an "inexplicable" decision can support an inference of sex bias (citing *Purdue*, 928 F.3d at 669)). For example, in *Purdue*, the plaintiff alleged a university official found him responsible for sexual violence based on her determination that the female complainant was credible, while he was not. 928 F.3d at 658, 669. Now-Justice Amy Coney Barrett explained that the university's decision was "perplexing," given that the complainant did not attend the hearing and her story was shared with the hearing panel via a letter from a Title IX coordinator. *Id.* Viewing this perplexing decision alongside the Dear Colleague Letter and various procedural irregularities alleged by the plaintiff, the court concluded the plaintiff plausibly alleged sex discrimination. *Id.* at 669–70.

A university decision can also be considered perplexing such that it supports an inference of sex bias if it fails to account for or explain significant inconsistencies in the evidence presented to the investigators or hearing panel. *See Univ. of S. Ind.*, 43 F.4th at 799–800 (explaining the panel's findings were not "evidence of bias" because the committee explained how it weighed inconsistencies in the plaintiff's and complainant's

stories, even if it "did not engage with those inconsistencies . . . as much as it could have"); *Univ. of Denver*, 1 F.4th at 832–34 (explaining that a decision that "can be construed as ignoring, downplaying, and misrepresenting inconsistencies in Jane's" story and in the case file can support an inference of sex bias); *Doe v. Univ. of Arkansas-Fayetteville*, 974 F.3d 858, 864–66 (8th Cir. 2020) (reasoning a university appeal panel's decision that Jane was incapacitated was "dubious" and "unexplained," and therefore supported a plausible inference of sex bias, because it was unsupported by evidence and ignored the Title IX coordinator's prior finding that Jane's alcohol consumption had not affected her decision-making or awareness); *Doe v. Am. Univ.*, No. 19-cv-03097 (APM), 2020 WL 5593909, at *7 (D.D.C. Sept. 18, 2020) (reasoning that an investigator's failure to "grapple with" "major inconsistencies" in Jane's story or "explain how they affected her view of [her] credibility" supported an inference of sex bias).

Plaintiff argues the panel's decision in his case was perplexing. This argument necessitates a closer look at the Outcome Letter issued in his sexual misconduct case. At the outset, the panel concluded, based on Jane's "negative drug test result and insufficient information or evidence to the contrary," that "the preponderance was not met that" Plaintiff drugged Jane or otherwise induced her incapacitation using a non-alcoholic substance. (Outcome Letter at 3). The panel then considered whether Jane was incapacitated by alcohol. (*Id.* at 3–4). In the end, the panel determined that:

> [b]ased on [Plaintiff's] statements in the hearing that he was able to observe his own intoxication from alcohol, [Plaintiff's] statements in the file and hearing that he observed [Jane] consume approximately the same amount of alcohol as he did, [Plaintiff's] statements in the file and hearing that [Jane] and [Plaintiff] consumed two bottles of wine together, and [Plaintiff's]

> statements in the hearing that there was approximately 5 minutes between sexual activity and being unable to wake [Jane] to consciousness, . . . [Jane] was incapacitated, and [Plaintiff] knew or should have known that she was unable to provide consent.

(*Id.* at 4–5).  The panel outlined the other evidence it considered in reaching this conclusion, including Plaintiff's inability at the hearing to describe what he observed that indicated Jane "was able to provide consent and was not incapacitated," witness statements about Jane's appearance and behavior when she left Plaintiff's apartment, and incoherent text messages sent by Jane.  (*Id.* at 3–4).

Plaintiff contends this Outcome Letter is perplexing for several reasons.  Most critically, he notes that Jane, throughout the investigation and hearing, stated she did not consume enough alcohol to be intoxicated to the point of incapacitation.  (*See, e.g.*, FIR Part 1 at 5; Hearing Transcript at 18).  Yet the panel did not mention these statements in the Outcome Letter.  Nor did it mention Jane's statements that she regularly consumed the amount of wine she drank with Plaintiff.  (*See* FIR Part 2 at 7 (Jane: "[I]'ve been drinking a lot recently that's why I'm very concerned as to how 3 glasses made me black out."); FIR Part 1 at 5 ("[Jane] stated that she has around 2-3 glasses of wine about four nights a week."); Hearing Transcript at 33–34 (Jane: "I was drinking a lot more.  So this was around normal, the normal amount that I would drink probably like nightly.  Not every night, but a lot, yeah.")).  Plaintiff therefore argues the panel's decision demonstrates that it accepted Jane's drugging story despite concluding that there was insufficient evidence to support such a story and that the panel was determined to find him, a man, responsible for sexual misconduct and therefore "contrived 'incapacitation' in a consensual encounter

for which both parties had consumed roughly the same amount of alcohol." (Pl.'s Resp. Br. at 22).[4]

Plaintiff's argument certainly paints a different picture than the plaintiff's allegations in *Purdue* (where the perplexing nature of the university's decision was tied up in various procedural irregularities alleged by the plaintiff). But Plaintiff has nonetheless identified a perplexing failure by the panel to deal with inconsistencies in the case file that, viewed in the light most favorable to Plaintiff, casts doubt on the accuracy of the panel's decision. Despite concluding Plaintiff did not drug Jane and despite receiving Jane's statements that she would not have been incapacitated by the amount of wine she drank, the panel nonetheless concluded Jane was incapacitated by the wine. The panel did not explain why it chose to largely credit Jane's story of the evening but not find credible her assertions that she could not have been (and, on a regular basis, was not) incapacitated by the amount of wine she drank. The panel repeatedly discredited Plaintiff's story of the night but did not, apparently, fully explore or explain Jane's credibility or inconsistency. *See Doe v. Purdue Univ.*, No. 2:17-cv-33-JPK, 2022 WL 3279234, at *12 (N.D. Ind. Aug. 11, 2022) (Kolar, J.) (reasoning the panel's decision supported an inference of sex bias where the panel did not "fully explore[]" inconsistencies in Jane's statements or Jane's credibility, despite "thoroughly

---

[4] Plaintiff also broadly contends that there is *no* evidence in the case file, other than Jane's statements about her lack of memory and the fact that Jane fell asleep shortly after her encounter with Plaintiff, that suggests Jane was incapacitated or that Plaintiff knew she was incapacitated. This goes too far and is not supported by the record. As discussed above, the panel based its conclusion on several pieces of evidence from the hearing and case file, including Plaintiff's own testimony and witness statements. (*See* Outcome Letter at 3–5).

scrutiniz[ing]" the plaintiff's statements and holding them "against him if they were found to be dishonest"); (Outcome Letter at 3–4 (holding against Plaintiff that he "was not able to articulate in the hearing what he observed . . . to indicate that [Jane] . . . was not incapacitated").

This is further complicated by the fact that the panel, in concluding Jane was incapacitated and not merely intoxicated and that Plaintiff knew of her incapacitation, relied heavily on Plaintiff's statements that he and Jane drank the same amount of wine and that he was intoxicated (but not incapacitated) by that wine. (*See* Outcome Letter at 3–4; FIR Part 1 at 35 (explaining the University's policy that "intoxication . . . is not presumptively equivalent to incapacitation")); *cf. Oberlin Coll.*, 963 F.3d at 588 (concluding plaintiff stated a claim for sex discrimination under Title IX in part because the panel's decision was "inexplicable" given that the evidence provided no basis for concluding the complainant was incapacitated, instead of intoxicated).

Many inferences could be drawn from the perplexing insufficiencies identified by Plaintiff in the panel's decision. For example, the panel could have concluded for any number of reasons that Jane's testimony about her alcohol tolerance was not credible. Or the panelists could simply not have liked Plaintiff for reasons entirely divorced from his sex. But it is equally plausible that the panel found Plaintiff responsible for sexual misconduct because he is a man and Jane is a woman. *See Purdue*, 928 F.3d at 669 ("It is plausible that [the University] chose to believe Jane because she is a woman and to disbelieve John because he is a man."). Thus, per Seventh Circuit caselaw, the "perplexing" nature of the panel's decision here, viewed against the backdrop of

19

Plaintiff's external pressure evidence and University data suggesting male respondents are punished more harshly than female respondents, could permit a reasonable jury to conclude the University discriminated against Plaintiff on the basis of his sex.

### 4.    Procedural irregularities

Additionally, Plaintiff identifies two procedural irregularities in his case—(1) the difference in resources provided to Jane and Plaintiff and (2) an investigator's failure to communicate Jane's willingness to consider alternative resolution—that he maintains also suggest an inference of sex bias in his case.

Procedural irregularities in a sexual misconduct case "can sometimes support an inference of sex discrimination" if they "are sufficiently numerous, lopsided, and/or important." *Univ. of S. Ind.*, 43 F.4th at 793; *see also Univ. of Cal.*, 23 F.4th at 941 ("[A]t some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding . . . ."). When the number of these "'irregularities increases, or the irregularities become more serious,' it begins to look less likely that the errors were due to benign reasons." *Univ. of S. Ind.*, 43 F.4th at 793 (quoting *Doe v. Samford Univ.*, 29 F.4th 675, 697–98 (11th Cir. 2022) (Jordan, J., concurring)). For example, in *Purdue*, the plaintiff compiled a mountain of procedural irregularities, alleging the investigative report did not include evidence favorable to him and falsely stated he confessed to the complainant's allegations, two hearing panelists stated that they did not read the investigative report, the third panelist asked him accusatory questions assuming his guilt, and the panel refused to hear from his witnesses. 928 F.3d at 657–58,

669.  The Seventh Circuit concluded these allegations supported a plausible inference of sex bias.  *Id.* at 669.

Here, one "irregularity" Plaintiff identifies is the disparity in resources the University provided to him and Jane.  The University gave Jane a "Complainant Information Form" that included a list of resources that was longer and different than the list in Plaintiff's "Respondent Information Form."  (FIR Part 1 at 36, 47).  The University also provided Jane a CVA, who served as her advisor, while Plaintiff had to hire an attorney to serve as his.  This evidence certainly supports an inference of a pro-complainant bias.  But, as discussed above, a pro-complainant bias does not support an inference of sex bias.  *See, e.g.*, *Ind. Univ.*, 2024 WL 1824967, at *2.  Plaintiff puts forth no evidence that a female respondent would have received more or different resources than Plaintiff or that a male complainant would have received different resources than Jane.  Thus, a reasonable juror could not infer Plaintiff received different resources because he is a man, rather than because he was a respondent accused of sexual misconduct.  *See Doe v. Marian Univ.*, No. 19-CV-388-JPS, 2019 WL 7370404, at *12 (E.D. Wis. 2019) ("There is no evidence by which a reasonable juror could infer that Doe was treated a certain way because of his gender, rather than because he was accused of raping someone."), *aff'd*, 829 F. App'x 731 (7th Cir. 2020).

Another irregularity Plaintiff identifies is the investigators' failure to relay Jane's willingness to further discuss alternative resolution.  When Jane rejected Plaintiff's alternative resolution proposal, she said she would consider future proposals with a harsher punishment for Plaintiff.  Yet Struble did not tell Plaintiff that Jane was willing to

consider such proposals. Additionally, when another investigator messaged Struble that they "need[ed] to consider whether [Plaintiff's] case is eligible for alt. res. due to the drugging allegation," Struble responded that Plaintiff was "not believable at all." (Struble Emails at 14). Plaintiff argues this evidence suggests that Struble assumed he was guilty and lied about Jane's willingness to discuss alternative resolution so that Plaintiff would receive a harsher punishment.

Plaintiff attempts to tie this to his sex by citing University data. He notes that the University had three sexual misconduct cases involving female respondents between 2019 and 2021 that "resulted in student discipline," and two of those were resolved with an alternative resolution agreement. (Def.'s Resp. to First Interrogs. at 14). But this data does not permit an inference that the University is more likely to permit female respondents to enter alternative resolution agreements or otherwise suggest that Struble's decisions in Plaintiff's case were influenced by his sex. Struble's failure to convey Jane's willingness and her comment about Plaintiff's believability are seemingly "divorced from" Plaintiff's sex. *See Columbia Coll. Chi.*, 933 F.3d at 856. So too is the fact that Plaintiff's case proceeded to a hearing. Given the University's policy that cases involving drugging allegations are sometimes not appropriate for alternative resolution, the evidence suggests Jane's allegation that Plaintiff drugged her, not his sex, prevented an alternative resolution agreement.

Plaintiff also makes the unsupported assertion that the "[q]uestioning by the hearing panel was mostly disorganized, irrelevant chaos, but demonstrated bias against" Plaintiff. (Pl.'s Resp. Br. at 9). He further contends the panelists' questioning of him

22

focused unnecessarily on "the lascivious details of the intimate contact between [Plaintiff] and Jane." (*Id.*).  But, again, Plaintiff fails to tie this to his sex.

In sum, a reasonable jury could not conclude the University discriminated against Plaintiff on the basis of sex based on the procedural irregularities he identifies.

### 5.   Discriminatory statements

Finally, Plaintiff compiles several statements made by university employees involved in his disciplinary process that he contends show overt anti-male bias.

Specifically, Plaintiff points to two tweets that Jackie Stelmaszczyk, the hearing chair, made and reposted—first, a tweet suggesting "men who ghost . . . ain't shit"[5] and, second, a retweeted cartoon stating that "the difference between being assertive [and] being aggressive" is "your gender."  (Filing No. 81-4, Stelmaszczyk Tweets at 2, 7).  But these tweets were posted on Stelmaszczyk's personal Twitter account, not a university account.  *Cf. Purdue*, 928 F.3d at 669 (reasoning that a university center reposting an article entitled "Alcohol isn't the cause of campus sexual assault.  Men are" on its Facebook page supported a plausible inference of sex bias).  Additionally, the tweets "have no connection to [Plaintiff's] case" and do not "call into question [Stelmaszczyk's] ability to review [Jane's] allegations objectively."  *Johnson*, 829 F. App'x at 733 (rejecting plaintiff's argument that an investigator's tweets on his personal Twitter account about

---

[5] Ghosting refers to "the act . . . of abruptly cutting off all contact with someone (such as a former romantic partner) by no longer accepting or responding to phone calls," texts, or other messages.  *United States v. Cancino*, 565 F. Supp. 3d 1029, 1032 n.3 (N.D. Ill. 2021) (quoting *Ghosting*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/ghosting).

reporting harassment and supporting Dr. Christine Blasey Ford during now-Justice Kavanaugh's Senate hearing supported an inference of sex bias); *see also Univ. of Cal.*, 23 F.4th at 938 (rejecting plaintiff's argument that an investigator tweeting "we need to teach young boys and men how to express their feelings and how to handle others' emotions" supported a plausible inference of sex bias).

Plaintiff also remarks that another panel member, Michael Courtney, demonstrated bias during the hearing by apologizing to Jane for asking her about her memory of the night. (*See* Hearing Transcript at 39 (Courtney: "[A]pologies for having [to] relive this.")). Again, at most, Courtney's apology "demonstrate[s] a pro-victim bias," which does not support an inference of sex bias. *Johnson*, 829 F. App'x at 733. The same can be said of an email to Jane in which Struble acknowledged that "the University's investigation process can be stressful" and stated that the Office "tr[ies] to limit the amount of information gathering meetings." (Struble Emails at 5). In sum, the discriminatory statements identified by Plaintiff do not support an inference of sex bias in his case.

But, overall, Plaintiff has put forth sufficient evidence to survive summary judgment. To be sure, each of the individual categories of evidence identified by Plaintiff—the external pressure evidence, the University data showing sex-based decision-making, and the panel's decision—could not, alone, support an inference of sex bias, in this or any case. *See Purdue*, 928 F.3d at 669–70. But taken together and viewed in the light most favorable to Plaintiff, Plaintiff's evidence could permit a reasonable jury to conclude the University discriminated against him on the basis of sex during his sexual

24

misconduct case.  Of course, a jury may not, in the end, buy the inferences Plaintiff is
selling.  But nonetheless, he survives summary judgment on his Title IX sex
discrimination claim.[6]

### B.    Section 1983 Claim

Plaintiff also sues the University under § 1983, arguing it violated the Fourteenth
Amendment by failing to provide Plaintiff due process in his sexual misconduct case.
The University argues it is entitled to summary judgment on Plaintiff's claim for several
reasons, including that it is not a suable person for the purposes of § 1983.  The court
agrees.

Section 1983 permits a plaintiff to sue a "*person* who, under color of" state law,
violated the plaintiff's constitutional rights.  42 U.S.C. § 1983 (emphasis added).  The
Supreme Court has made clear that "a State is not a person within the meaning of
§ 1983."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989); *Arizonans for Off.
English v. Arizona*, 520 U.S. 43, 69 (1997).  Indiana University is "considered part of the
state for § 1983 analysis."  *Williamson v. Ind. Univ.*, 345 F.3d 459, 463 (7th Cir. 2003).
So too is its Board of Trustees.  *See Peirick v. Ind. Univ.-Purdue Univ. Indianapolis*

---

[6] The parties also briefly discuss whether Plaintiff may seek emotional distress damages under
Title IX.  *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022); *Doe v. Loyola
Univ. Chi.*, No. 22-2925, 2024 WL 1953489, at *1 (7th Cir. May 3, 2024) (noting that *Cummings*
bars recovery of emotional distress damages under Title IX).  This argument is premature and
would be more appropriately resolved in a motion *in limine* prior to trial.  *See McFarthing v.
Colone*, No. 19 C 0777, 2020 WL 3250740, at *10 (N.D. Ill. June 16, 2020) ("The prayer for
relief and the type of damages sought therein is not a part of the claims or defenses . . . and is not
a proper subject for summary judgment."); *D.A. v. Meridian Joint Sch. Dist. No. 2*, 289 F.R.D.
614, 626 (D. Idaho 2013) ("The issue [of] whether Plaintiffs' prayer for relief seeks particular
types of damages unavailable under the Rehabilitation Act and the ADA is premature at th[e]
[summary judgment] stage . . . .").

*Athletics Dep't*, 510 F.3d 681, 695–97 (7th Cir. 2007) (explaining "the Board of Trustees of Indiana University is an agency of the state"); *Patton v. Ind. Univ. Bd. of Trs.*, 1:20-cv-00699-TWP-MJD, 2022 WL 3716522, *6 (S.D. Ind. Aug. 29, 2022) (explaining "states and state agencies are not 'persons' under Section 1983" and that "the Indiana University Board of Trustees is a state agency"); *Malhotra v. Univ. of Ill. at Urbana-Champaign*, 77 F.4th 532, 535 (7th Cir. 2023) (explaining a board of trustees is "an alter ego of the state, rather than a person"). Here, Plaintiff sues Indiana University's Board of Trustees, which is not a suable "person" within the meaning of § 1983, meaning Plaintiff cannot maintain his due process claim against the University.

Plaintiff obliquely responds that prospective injunctive relief is available under *Ex parte Young*, which creates a limited exception to Eleventh Amendment immunity that permits plaintiffs to sue state officials for prospective injunctive relief. 209 U.S. 123, 159–60 (1908). But Plaintiff has not sued a state official. Again, he sues only one defendant, Indiana University's Board of Trustees, which is a state agency. *Haynes v. Ind. Univ.*, 902 F.3d 724, 731 (7th Cir. 2018). *Ex parte Young* does not permit suits against state agencies, even where the relief sought is prospective. *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) ("The doctrine of *Ex parte Young* . . . has no application in suits against the State and their agencies, which are barred regardless of the relief sought."); *see also Peirick*, 510 F.3d at 696–97 (collecting cases); *cf. Kashani v. Purdue Univ.*, 813 F.2d 843, 848 (7th Cir. 1987) (affirming dismissal of claims against university but permitting suit against individually named university officials for prospective injunctive relief); *Purdue Univ.*, 928 F.3d at 666–67 (approving

of plaintiff seeking prospective injunctive relief, including expungement of disciplinary record, against named university officials).

Therefore, the University is entitled to summary judgment on Plaintiff's § 1983 claim.

## IV.    Conclusion

For the reasons discussed above, Defendant's Motion for Summary Judgment (Filing No. 74) is **GRANTED in part** and **DENIED in part**.  Defendant's motion is **GRANTED** with respect to Plaintiff's § 1983 claim but **DENIED** with respect to Plaintiff's Title IX claim.

**IT IS SO ORDERED** this 3rd day of June 2024.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsels of Record.